STERN & CO., Plaintiff,

v.

STATE LOAN AND FINANCE CORPO-
RATION, Defendant.

Civ. A. No. 2429.

United States District Court
D. Delaware.
Feb. 10, 1965.

See also D.C., 205 F.Supp. 702.

E. N. Carpenter, II, Richards, Layton & Finger, Wilmington, Del., William R. Hudson and Bernard V. Lentz, White & Williams, Philadelphia, Pa., of counsel, for plaintiff.

Carl Bauersfeld, Washington, D. C., Howard L. Williams, Wilmington, Del., of counsel, for defendant.

STEEL, District Judge.

This is a civil action to recover damages in the amount of $28,675.77, plus punitive damages, for breach of contract.

## FINDINGS OF FACT

1. Plaintiff is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

2. Defendant is a Delaware corporation with its principal place of business in Washington, D. C.

3. The plaintiff, prior to September 20, 1956, operated a chain of department stores in Pennsylvania, New Jersey and Delaware engaged in the business of selling home furnishings and clothing at retail. In each of plaintiff's stores, or very close to them, plaintiff's wholly owned subsidiaries operated a loan and finance business. The loan and finance businesses were operated by the following wholly owned subsidiaries of plaintiff; Interstate Loan Company, a Pennsylvania corporation; Interstate Consumer Discount Company, a Pennsylvania corporation; Interstate Finance Company, a New Jersey corporation, and Interstate Finance Company, a Delaware corporation.

4. The defendant, State Loan and Finance Corporation, is a holding com-

pany that owns the stock of a number of small loan companies. Defendant is not an operating company. Its business consists of raising capital and loaning the money to its subsidiary corporations to conduct their operations.

5. Prior to August 23, 1956, plaintiff had a loan agreement with a number of banks in Philadelphia. Following the death of Harry I. Stern, President of plaintiff, in May 1956, the banks called upon plaintiff to pay the loans within a year. The banks suggested that the plaintiff sell its wholly owned loan and finance companies. Plaintiff first attempted to sell the business of its loan and finance companies to Ritter Finance Company in August 1956 for $2,500,000, but Ritter Finance Company was unable to finance the purchase.

6. On August 23, 1956, officers of the defendant met with officers of the plaintiff for purposes of discussing the possibility of purchasing the loan and finance business operated by plaintiff's subsidiaries. At that meeting, defendant's officers advised plaintiff's officers that defendant was primarily interested in acquiring the loans receivable of plaintiff's subsidiaries. Plaintiff advised that it wanted $2,500,000 for the business and, in addition, the purchaser was to pay off the liabilities of plaintiff's subsidiaries. The purchase price, together with the assumption of liabilities, totalled approximately $7,000,000. Plaintiff advised that it would take $1,250,000 in cash and $1,250,000 in notes in payment of the purchase price, but that it would not simply sell the assets of the business but would only sell the corporate stock of its subsidiaries because of the time element involved.

7. At the meeting of August 23, 1956, defendant advised plaintiff that because of its policy of having each of its loan offices a separate corporation, it could not make the transaction unless it could work out a method of having each office a separate corporation. In addition, defendant advised plaintiff that because the loan offices operated by plaintiff's subsidiaries were located in its stores, and the customers of the stores were the same persons who were customers or borrowers of the loan companies, it desired plaintiff to agree not to compete for a period of time. Defendant advised that it was going to discuss with its tax counsel a method whereby each loan office could be operated as a separate corporation. Maurice Fierman, President of the plaintiff, then requested defendant's officers to inquire of their tax counsel what the tax consequences of the transaction would be to plaintiff and to write him a general summary of the discussion and basis of the proposed sale, and include in the letter what tax counsel had advised about plaintiff's tax situation.

8. Pursuant to the request of plaintiff's President, defendant, by its Executive Vice President, on August 30, 1956, sent the plaintiff a letter which states:

"This letter will confirm our recent discussion with respect to the acquisition of your loan and finance subsidiaries, providing we are successful in arranging the necessary additional financing to complete the transaction. The basis of sale is to be the purchase of the outstanding capital stock of the subsidiaries for a total purchase price of $2,500,000 of which at least one half will be paid in cash at the time the transaction is completed and the balance to be represented by a promissory note payable in four equal quarterly installments and bearing interest at the rate of 4½% per annum on the unpaid balance. As you probably know, the money market is about the tightest in history, but we feel we are making progress, and as previously agreed, will give you a definite answer on or before September 7, 1956.

"As you know, we are interested primarily in acquiring the loans receivable of your subsidiaries, and the acquisition procedure set forth below is proposed because you have advised us you will not simply sell the assets consisting of loans receivable and furniture and fixtures, but will only

sell the corporate stock of your loan and finance subsidiaries.

"With this consideration in mind, State Loan and Finance Corporation will form a subsidiary in the state of Pennsylvania which will enter into a contract with your company to purchase the issued and outstanding capital stock of Interstate Loan Company of Pennsylvania. An additional Pennsylvania subsidiary will be formed which will purchase the outstanding capital stock of Interstate Consumer Discount Company. The same procedure will be followed by forming a New Jersey subsidiary to purchase the capital stock of Interstate Finance Company of New Jersey, and a Delaware subsidiary will be formed to purchase the capital stock of Interstate Finance Company of Delaware.

"The acquisitions will be handled under separate contracts between our subsidiaries and your company. Under the terms of these contracts, your company will convey to our subsidiaries, all of the outstanding stock of one of your subsidiaries for a proportionate part of the purchase price set out herein. In addition, certain covenants and warranties will be required with respect to the validity and authenticity of the corporate existence of your subsidiaries as well as their assets and liabilities, with particular reference to the validity of the loan contracts and a guarantee against undisclosed liabilities.

"We are enclosing herewith a form of contract which we propose to use in completing this transaction. This contract is the standard form we have used in a great number of acquisitions of corporate stock.

"From your standpoint, the transaction will simply entail your sale of all of the stock of your subsidiaries for the purchase price set out in the first paragraph of this letter. We are advised by counsel this sale will constitute a taxable transaction for federal income tax purposes, and you will be required to report the gain or profit on each of the sales. By definition of Section 1221 of the 1954 Internal Revenue Code, corporate stock constitutes the capital asset so that the gain or profit on the sales will be taxable at capital gain rates, which at present is a maximum of 25% of the gain.

"While we realize your company is not concerned with our procedures after completion of the purchase of this stock, we felt you might be interested in knowing that after the purchase, our subsidiaries will liquidate and dissolve the corporations which they have acquired under the provisions of Section 334(b) (2) of the Internal Revenue Code. This procedure is necessary since our purpose in this purchase is to acquire the loan contract of your subsidiaries rather than their stock. Following this liquidation and in line with our corporate policy of having each office a separate corporation, we will form additional subsidiaries in Pennsylvania and New Jersey, each of which will acquire the assets of one office."

The letter was mailed from Washington, D. C. and was received in Philadelphia.

9. The form of contract submitted with defendant's letter of August 30, 1956, contained the following paragraph:

"7. As a material part of the consideration for this contract, Seller specifically agrees that it will not, for a period of three (3) years from and after the date of this Agreement, either directly or indirectly, individually or in association with others, engage in the business of making loans in the amount of six hundred dollars ($600.00) or less under the provisions of the Pennsylvania Small Loan Act, nor under the provisions of any other of the laws of the States of Pennsylvania or New

Jersey, in the Cities or Communities of Philadelphia, Chester, West Philadelphia, Norristown, Kensington, Upper Darby, Allentown, Easton, Reading, Germantown, Mayfair, South Philadelphia, Woodland, Hatboro, Lansdale, West Chester and Lancaster, Pennsylvania or within fifteen (15) miles of the city limits thereof.

"Seller further warrants and covenants that neither it nor any other person, including the employees of the INTERSTATE LOAN COMPANY, have a list, record or document containing the names and addresses of its present and/or former borrowers, and Seller hereby covenants and agrees that it will keep secret from every person, firm or corporation whatsoever, the names of any of the past, present or prospective borrowers of the INTERSTATE LOAN COMPANY."

10. Joseph Shanis, Vice President of the plaintiff and a lawyer, participated in the negotiations between plaintiff and defendant. Plaintiff, upon receipt of defendant's letter of August 30, 1956, referred the letter and the accompanying contract to their counsel for an opinion as to the tax consequences of the proposed transaction. Plaintiff was advised by its counsel that the transaction would be taxed at capital gains rates to the plaintiff.

11. On September 7, 1956, defendant met with plaintiff in Philadelphia and advised that it felt the necessary financing had been arranged to go forward with the transaction. The terms of the contract were discussed. It was agreed that settlement would be made on September 20, 1956 in Philadelphia. A notation to this effect was placed on the bottom of the letter of August 30, 1956, and signed by plaintiff and defendant. In addition, each of the parties signed a long hand memorandum which read as follows:

"It is agreed that (1) State Loan and Finance Corp. will sign the promissory note or notes for $1,250,-000, the final one being due Sept.

1, 1957. (2) State Loan & Finance Corp. or its subsidiaries will pay off the indebtedness to Stern & Co. and Tradesmen's Bank. (3) Stern & Co. shall have the right to negotiate all taxes listed under paragraph 5."

12. At the conclusion of the meeting on September 7, 1956, plaintiff requested defendant to re-draft the contract and re-submit a sample form of contract. On September 10, 1956, defendant's Assistant General Counsel wrote plaintiff's President a letter as follows:

"As requested by your attorney, I am enclosing herewith a sample form of contract covering the acquisition of your loan subsidiaries. I trust that we have included herein the various suggestions which were made at our meeting yesterday.

"If there is any question with respect to this, both Mr. Williams and myself will be back in the office the end of next week; or if necessary the office will know how to get in touch with us by telephone."

13. On September 11, 1956, Mr. Shanis, on behalf of plaintiff, called Mr. Holroyd, defendant's Assistant General Counsel in Ashville, North Carolina, and discussed various terms of the proposed contract that had been submitted with the letter of September 10, 1956. The questions discussed included liability for loan subsidiaries' 1956 taxes, warranties on the validity of loans, and a provision relative to customer lists. The contract was the subject of further telephone conversation by the parties on September 12, 1956, wherein defendant's subsidiaries received the right to specifically make an assignment of the covenant not to compete under paragraph 7, and the period of time in the covenant not to compete was extended from three years to five years.

14. On September 12, 1956, plaintiff, by Mr. Shanis, wrote a letter to Holroyd in Ashville, North Carolina, confirming their telephone conversation and outlining certain terms and conditions with respect to the proposed contract.

15. Defendant's counsel returned to their Washington office from Ashville, North Carolina, on or about September 17, 1956, and re-drafted the proposed agreements to include the additional changes. After the contracts were re-drafted, the language of the contracts was read to Mr. Shanis over the telephone and he approved the form thereof.

16. On September 20, 1956, the parties met in Philadelphia and signed four documents, each of which was labeled "AGREEMENT", and took all action essential to consummating the transaction. Two of the documents were signed by plaintiff, as seller, and defendant, as buyer. One pertained to the stock of Interstate Consumer Discount Company, a Pennsylvania corporation; and the other to Interstate Finance Company, a Delaware corporation. The third document was executed by plaintiff, as seller, and American Finance Corporation, a wholly owned subsidiary of defendant, as buyer, and pertained to the stock of Interstate Company, a Pennsylvania corporation. The fourth document was signed by plaintiff, as seller, and American Finance Corporation of Trenton, a wholly owned subsidiary of defendant, as buyer, and pertained to the stock of Interstate Finance Company, a New Jersey corporation.

17. The two wholly owned subsidiaries of defendant, American Finance Corporation and American Finance Corporation of Trenton, were the corporate entities chosen by defendant as the means of carrying out defendant's agreement with plaintiff to purchase from plaintiff the stock of the four loan companies for an aggregate amount of $2,500,000. The fact that defendant chose to consummate part of its contract with plaintiff through its two subsidiaries, was of no concern to plaintiff since its pressing bank loans were taken care of and it received $1,250,000 in cash and $1,250,000 in notes signed by defendant. All actions taken by defendant's subsidiaries before the Internal Revenue Service and before the Tax Court were pursuant to defendant's direction or with its approval.

18. The document executed by plaintiff and American Finance Corporation provided among other things:

"1. Purchaser agrees to purchase subject to the conditions and covenants hereinafter set out, and Seller agrees to sell or cause to be sold to Purchaser all of the issued and outstanding capital stock of INTERSTATE LOAN COMPANY, a Pennsylvania corporation with its principal place of business in Chester, Pennsylvania; said issued and outstanding capital stock consisting of 250 shares of Common Stock with the par value of $100 per share, for the aggregate purchase price of $1,424,976.87, which amount is payable upon the execution of this Agreement by the parties hereto in cash or in promissory notes acceptable to the Seller.

\*    \*    \*    \*    \*    \*

"7. As a material part of the consideration for this contract, Seller specifically agrees that it will not, for a period of five (5) years from and after the date of this Agreement, either directly or indirectly, individually or in association with others, engage in the business of making loans in the amount of six hundred dollars ($600) or less under the provisions of the Pennsylvania Small Loan Act, nor under the provisions of any other of the laws of the States of Pennsylvania or New Jersey, in the cities or communities of Allentown, Chester, Easton, Germantown, Hatboro, Kensington, Lancaster, Lansdale, Mayfair, Norristown, Philadelphia, Reading, South Philadelphia, Upper Darby, West Chester, West Philadelphia and Woodland, Pennsylvania or within fifteen (15) miles of the city limits thereof.

"It is understood and agreed that Purchaser shall have the right to convey or assign and transfer this covenant in whole or in part and in

such event the transferee shall have the same rights hereunder as Purchaser."

19. Similar provisions, with varying dollar amounts, were contained in the document executed by plaintiff and American Finance Corporation of Trenton, a New Jersey corporation.

20. The amounts specified as the purchase price of the stock of the loan companies in the documents executed by plaintiff and defendant's two subsidiaries, and the amounts similarly specified in the two documents executed by plaintiff and defendant, aggregated $2,500,000.

21. The agreements of September 20, 1956, between plaintiff and defendant regarding Interstate Consumer Discount Company, a Pennsylvania corporation, and Interstate Finance Company, a Delaware corporation, did not contain covenants not to compete. The reason these contracts did not contain covenants not to compete was that the defendant did not intend to carry on the businesses operated by those corporations and, therefore, did not need the protection of a covenant.

22. All significant events relating to the formation and performance of the contract took place in Pennsylvania.

23. On October 31, 1956, the assets of Interstate Loan Company, a Pennsylvania corporation, were transferred in liquidation to American Finance Corporation, and the assets of Interstate Loan Company, a New Jersey corporation, were transferred in liquidation to American Finance Corporation of Trenton.

24. On November 1, 1956, the former assets of Interstate Loan Company, a Pennsylvania corporation, with respect to each individual loan office, were sold and transferred by American Finance Corporation to the 17 wholly owned subsidiaries of the defendant located in Pennsylvania, and the former assets of Interstate Loan Company, a New Jersey corporation, were sold and transferred by American Finance Corporation of Trenton to two additional wholly owned subsidiaries of the defendant located in New Jersey. However, the assets applicable to the Trenton office was retained by the American Finance Corporation of Trenton which continued to operate the Trenton office itself. Each of the agreements of sale and transfer to the subsidiary corporations of the defendant, included an assignment and transfer of plaintiff's covenant not to compete as contained in the agreements of September 20, 1956. These transfers to the subsidiary corporations were necessary to carry out the defendant's policy of having each of its loan offices operated as a separate corporation.

25. On November 1, 1956 entries were made on the books of each of the transferee subsidiaries under the heading of "Business Development Expense" in varying dollar amounts which aggregated $1,218,742.80. This latter figure represented the amount by which the $2,500,000 paid to plaintiff exceeded the book value of the assets of the loan companies which plaintiff sold. The entries for the excess cost were made for (a) covenant not to compete and (b) cost of intangibles with a known life.

26. Commencing with the taxable year 1956, American Finance Corporation of Trenton and the nineteen transferee subsidiaries, at the direction of the Treasurer of defendant, as to the years 1956 through 1958, and of its Assistant Treasurer for the years 1959 through 1962, filed Corporate Income Tax Returns claiming deductions for "New business development expense" or "Amortization of excess cost over book value of loans receivable acquired in liquidation." The total amount allocated among said transferee subsidiaries and American Finance Corporation of Trenton for said deductions was $1,218,742.80.

27. On March 11, 1959, the Commissioner of Internal Revenue, through the District Director of Internal Revenue, Baltimore, Maryland, issued notices of deficiency against defendant's subsidiaries and, among other things, disallowed as deductions the amount claimed as "New business development" for the

years 1956 and 1957. The reason for the disallowance given by the Commissioner of Internal Revenue in the notice of deficiency was that the expenditure represented a purchase of good will.

28. Defendant's subsidiaries contended to representatives of the Internal Revenue Service and in the Tax Court of the United States that the sum of $1,218,742.80 (a) had been paid for covenants of plaintiff not to compete, and (b) the amount paid in excess of book value of the loan accounts was paid for intangibles with a known life of five years and, therefore, amortizable over said period, and that either ground independently of the other represented a legal basis for the deductions made in the tax returns by defendant's wholly owned subsidiaries.

29. Plaintiff filed its Federal Corporate Income Tax Return for the year 1956, reporting the entire profit on the sale of the stock of the loan companies as capital gain and paying the tax thereon at capital gain rate. The return was audited in September 1958 by the Internal Revenue Service and the treatment of the profit on the sale of the loan companies as capital gain was not questioned. The capital gains reported were reduced and resulted in plaintiff receiving a refund for the year 1956.

30. On April 18, 1961, plaintiff received from the Philadelphia District Director of Internal Revenue a letter informing plaintiff that the purchasers of certain of the stock of the loan companies had treated a portion of the purchase price as payment for covenants not to compete, and notifying plaintiff that plaintiff's return for 1956 was to be reopened.

31. On October 9, 1961, the Commissioner of Internal Revenue issued a notice of deficiency to plaintiff for the year 1956 determining a deficiency in the amount of $329,060.55. The reason given in the notice of deficiency was that it was determined that plaintiff received $1,218,742.80 in 1956 as payment for covenants not to compete, which amount is taxable as ordinary income and not as long-term capital gain as reported.

32. Thereafter, plaintiff filed a petition with the Tax Court and employed counsel to contest the asserted deficiency.

33. The proceedings in the Tax Court of the United States for redetermination of the tax liability of plaintiff for the year 1956 arising out of the sale of plaintiff's loan companies to defendant and its subsidiaries were terminated by an order assessing no liability against plaintiff.

34. The proceedings in the Tax Court of the United States for determination of tax liability of defendant's subsidiaries arising out of the sale of the loan companies to defendant's subsidiaries, and the deductions claimed by defendant's subsidiaries for amortization of the amounts claimed by them, were terminated by orders fixing deficiencies in amounts agreed upon by compromise between defendant's subsidiaries and the Internal Revenue Service. In the settlement with the Internal Revenue Service, defendant was allowed to amortize 25% of the excess cost over book value of the intangible assets purchased.

35. When plaintiff received defendant's letter of August 30, 1956, together with the enclosed form of contract, the plaintiff was represented by counsel and did not rely upon the tax advice suggested in defendant's letter, but sought and procured advice and opinion of its counsel as to the tax consequences of the transaction. Plaintiff did not enter into the agreements of September 20, 1956 in reliance upon the tax advice suggested in defendant's letter of August 30, 1956. The tax advice which was given to plaintiff by its own counsel, and upon which plaintiff relied, was based upon the statements contained in defendant's letter of August 30, 1956 and its attached "standard form" of contract.

36. At the time when defendant wrote the letter of August 30, 1956, it intended to attempt to amortize, over the life of the intangible assets of the loan companies it had acquired, the amount by

which the consideration paid plaintiff exceeded the book value of the assets of the loan companies, and to contend that the covenant not to compete was part of such intangible assets.

37. Plaintiff employed counsel to contest the aserted tax deficiency. Plaintiff was charged by and paid to its counsel $25,000 plus costs of $628.90 for services (i) in contesting the tax deficiency, and (ii) in attempting in the present action to enjoin defendant from contending before the Internal Revenue Service and in the Tax Court that any part of the monies paid to plaintiff represented the price of plaintiff's covenant not to compete.

38. Of the total fee charged plaintiff by its counsel, the amount of $20,000 is fairly allocable directly to the services performed by plaintiff's counsel in contesting the asserted tax deficiencies before the Internal Revenue Service and in the Tax Court of the United States, and the amount of $5,000 is fairly allocable to the injunction proceedings brought by plaintiff. Both of said fees were fair and reasonable under all the circumstances. Of the total costs of $628.90, $275.70 thereof were properly allocable to contesting the asserted tax deficiencies and were reasonable in amount.

39. The parties intended that the terms of the contract should be found in defendant's letter of August 30, 1956 signed by both parties on September 7, 1956, the memorandum signed by the parties on September 7, 1956, and the four documents which were signed on September 20, 1956, and their contract is to be interpreted in the light of all of these documents.

40. By the contract the parties expressly agreed that the $2,500,000 which plaintiff received should be the selling price of the stock which defendant and its subsidiaries acquired. By implication, defendant agreed that neither it nor its subsidiaries would do anything to jeopardize plaintiff's right to treat the $2,500,000 as the selling price of the stock before the tax authorities so as to obtain capital gains treatment for the entire consideration taxable at a maximum rate of 25%.

41. The defendant breached its implied agreement when it authorized its subsidiaries to make the argument, among others, to representatives of the Internal Revenue Service and to the Tax Court that of the $2,500,000 paid to plaintiff, $1,218,742.80 represented the price paid for plaintiff's covenant not to compete.

42. The attorneys' fees of $20,000 and the expenses of $275.77 which plaintiff paid in successfully maintaining its position before the Tax Court are the damages sustained by plaintiff and were proximately caused by defendant's breach of its implied agreement.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction under 28 U.S.C. § 1332.

2. The question of what constituted the contract between the parties, its interpretation and effect, whether it was breached, and the consequences of its breach are to be determined by Pennsylvania law.

3. Under Pennsylvania law there is no requirement that a contract be evidenced by a single instrument. If the parties wish and so intend, they may express their agreement in more than one writing and in such circumstances, the several documents are to be interpreted together, each one contributing, to the extent of its worth, to the ascertainment of the true intention of the parties.

4. Under Pennsylvania law the contract is deemed to contain not only what is expressly agreed to but also whatever may be reasonably implied to give effect to the intention of the parties. In all contracts there is an implied promise by each party not to obstruct or deprive the other party of the benefits which he may reasonably expect to obtain under the contract.

5. The reasonableness of the attorneys' fees which plaintiff paid in connection with its tax controversy is to

be determined in light of standards of Philadelphia tax attorneys.

■ 6. Under Federal income tax law, a seller of corporate stock will be denied capital gains treatment of any sums of money paid for a covenant not to compete given by the seller in connection with the sale. If a buyer of stock is to be entitled to deduct or amortize any amounts paid for such covenant, then the seller must report those amounts as ordinary income.

■ 7. Under Section 334(b) (2) of the Internal Revenue Code, a corporation qualified thereunder which purchases the capital stock of another corporation and in turn liquidates the corporation, is permitted to attribute and allocate the purchase price of the capital stock to the property, and only to the property, received upon and by reason of the liquidation of the corporation.

■ 8. The covenants not to compete as contained in two of the agreements between plaintiff and defendant's subsidiaries were never the property of any of plaintiff's loan companies, and could in no event have been received upon and by reason of their liquidation pursuant to Section 334(b) (2) of the Internal Revenue Code.

■ 9. Under the law of Pennsylvania punitive damages are not awarded for breach of a contract other than one to marry, and plaintiff may not recover such damages.

10. Plaintiff is entitled to judgment against defendant in the amount of $20,275.77 for compensatory damages.

## DISCUSSION

This controversy is the outgrowth of the sale by plaintiff of the stock of four loan companies. Plaintiff sold the stock of two of the companies to defendant. At defendant's request, plaintiff sold the stock of the other two companies to wholly owned subsidiaries of defendant. The acquisition of the stock by the subsidiaries and all relevant actions thereafter taken by them before the taxing authorities were authorized and directed by defendant.

Plaintiff's claim to relief is based upon the theory that defendant expressly agreed that the aggregate purchase price of the stock of the four companies would be $2,500,000, and that defendant impliedly agreed that neither it nor its subsidiaries would take any action to jeopardize plaintiff's right to have the entire $2,500,000 so treated in reporting the transaction as a capital gain taxable at the maximum rate of 25%. The stock of the four loan companies had a tax basis to plaintiff of about $250,000.

Plaintiff contends that defendant breached its implied agreement by causing two of its subsidiaries to make the contention, among others, to representatives of the Internal Revenue Service and before the United States Tax Court that $1,218,742.80 of the $2,500,000 had been paid for a covenant by plaintiff not to compete, and for this reason they were entitled to amortize the $1,218,742.80 over the five year period of the covenant.

It is not disputed that this contention prompted I.R.S. to reopen its examination of plaintiff's tax return and to assess a tax deficiency against plaintiff of $329,060.55. This was done upon the theory that if defendant's subsidiaries paid $1,218.742.80 for plaintiff's covenant, as they claimed, plaintiff received a like amount for the covenant, and hence that amount was taxable to plaintiffs as ordinary income at 52% instead of at the capital gains rate of 25%, which the I.R.S. in its earlier audit had not questioned.

The compensatory damages which plaintiff seeks to recover represent the expenses which it incurred, primarily for the services of attorneys, in contesting and ultimately defeating the additional assessment. Charging that defendant acted in bad faith in concealing from plaintiff its true tax intention, plaintiff also seeks punitive damages.

Defendant denies that it and its subsidiaries paid $2,500,000 solely for the stock. It points out that each of the contracts between plaintiff and its sub-

sidiaries provided that the covenant not to compete was "a material part of the consideration", and from this argues that it was proper for the subsidiaries to claim that $1,218,742.80 was the price which they paid for the covenant. Defendant denies that it agreed that it or its subsidiaries would report the transaction to the taxing authorities in any particular way, and asserts that what the subsidiaries did violated no provision, express or implied, of the contract. Defendant likewise challenges the reasonableness of the attorneys' fees claimed by plaintiff, and argues that in no event do the circumstances warrant the imposition of punitive damages.

At the outset, the parties are at odds concerning the precise documents which embody their contract. According to plaintiff, it consisted of several writings: the letter dated August 30, 1956 from defendant to plaintiff which both signed on September 7, 1956; the memorandum signed by plaintiff and defendant on September 7, 1956; and the four documents executed on September 20, 1956 at the time of the closing.[1]

Defendant, on the other hand, argues that everything which took place prior to September 20, 1956, simply constituted steps in a series of negotiations which led up to and were merged or integrated into the documents executed on September 20, 1956, and that they alone embody the terms of the agreement.

All significant actions concerning the making of the contract and its performance, occurred in Pennsylvania. Both parties have assumed that Pennsylvania law must be looked to to determine the identity of the documents which comprised the contract, its construction, and whether it was breached. What will be said is, therefore, based upon the premise that Pennsylvania law is controlling in these areas.

In Pennsylvania there is no requirement that a contract be evidenced by a single instrument. If the parties wish, they may express their agreement in more than one writing and in such circumstances, the several documents are to be interpreted together, each one contributing, to the extent of its worth, to the ascertainment of the true intent of the parties. Housing Mortgage Corp. v. Allied Constr., Inc., 374 Pa. 312, 319, 97 A.2d 802, 805 (1953). Whether or not an agreement is deemed to be integrated in a single writing depends upon the intention of the parties. If it can be shown by competent evidence that no single writing embodied, or was intended to embody, the whole of the parties' understanding, the parol evidence rule has no application and the several documents in which the parties intended to express their understanding will be interpreted together. Rekas v. Dopkavich, 362 Pa. 292, 297–298, 66 A.2d 230, 233 (1949). These principles were reaffirmed in International Milling Co. v. Hachmeister, Inc., 380 Pa. 407, 110 A.2d 186, 191 (1955).[2]

1. Only two of the documents executed on September 20 were signed by plaintiff and defendant. The other two were signed by plaintiff and defendant's two purchasing subsidiaries. The latter simply served as the instrumentalities chosen by defendant to carry out the overall agreement between plaintiff and itself under which it and its subsidiaries were to acquire the stock of the four loan companies.

2. Section 2–202 of the Pennsylvania Uniform Commercial Code-Sales, 12A P.S. § 2–202, deals with the integration of contracts, and is consistent with the "parol evidence rule" under the Pennsylvania decisions. See Pennsylvania Bar Association Notes to § 2–202. The Uniform Commercial Code Comment, in discussing the purpose of § 2–202, states:

"This section definitely rejects:

"(a) Any assumption that because a writing has been worked out which is final on some matters, it is to be taken as including all the matters agreed upon."

Generally speaking, investment securities, such as the stock of the loan companies, is excluded by § 2–105 from Article 2 of which § 2–202 is a part. However, the Comment to § 2–105 makes

■ Defendant's theory that the writings of September 20, 1956 embody the entire agreement of the parties must be rejected as contrary to the parties' intention. The documents executed on September 20, although seemingly complete in themselves, omit several important provisions found in the letter of August 30 and memorandum of September 7 which the parties clearly intended to be a part of their bargain. The September 20 writings said nothing about the obligation of defendant and its subsidiaries to liquidate the bank loans of plaintiff and its subsidiaries. These amounted to $4,435,900. The necessity for the banks being paid was understood by both parties when they met on August 23, 1956, was expressly provided for in the September 7, 1956 memorandum, and at the closing arrangements were made to pay the banks.

Furthermore, each of the writings dated September 20, 1956, stated that the purchase price of the stock should be paid either "in cash or in promissory notes acceptable to the seller." None said anything about the proportion of the purchase price to be paid in cash, the maturity date of the notes, their interest, or the identity of their maker. The reason is clear. These critical details had been agreed upon in the letter of August 30 and the memorandum of September 7. The letter of August 30 provided that 50% of the purchase price was to be paid in cash and the balance by notes. It also stated that the notes should bear 4½% interest and should mature in four equal quarterly installments. The memorandum of September 7 provided that the notes should be signed by the defendant[3] and that the final installment should be due on September 1, 1957. The notes which plaintiff received at the closing conformed to the provisions of the August 30 letter and the September 7, 1956 memorandum.

With so many crucial terms of the agreement as consummated ascertainable only by reference to the letter of August 30 and the memorandum of September 7, the inference is compelling that the parties intended that those two writings, as well as the four documents which they executed on September 20 should, when read together, be the memorial of their contract.

It is of no consequence that the stock of two of the loan companies was acquired by defendant, whereas the letter of August 30 provided that the stock of all four of the loan companies should be purchased by subsidiaries of defendant.[4] To the extent that the provisions of the August 30 letter were inconsistent with the documents of September 20, the latter obviously superseded the former. The important fact is that the portions of the August 30 letter which had income tax significance were never changed.

The August 30 letter stated:

" * * * The basis of sale is to be the purchase of the outstanding capital stock of the subsidiaries for a total purchase price of $2,500,000 * * * ".

* * *

"The acquisitions will be handled under separate contracts between our subsidiaries and your company.

clear that the application by analogy of a particular section of Article 2 to securities was not intended to be excluded when the reason of the section makes such application sensible, and the situation involved is not covered by Article 8 which deals specifically with securities.

3. While normally it might be expected that the parties acquiring the stock would be the makers of notes, apparently plaintiff was not satisfied to take the notes of the subsidiaries of defendant which by the terms of the documents of September 20, 1956 were to acquire the stock of two of the loan companies. Hence, the memorandum of September 7, 1956 specified that all of the notes should be signed by the defendant.

4. The corporate entities chosen by defendant as the means of carrying out its agreement with plaintiff were of no concern to plaintiff, since its pressing bank loans were taken care of, and it received $1,250,000 in cash and $1,250,000 in notes signed by defendant.

Under the terms of these contracts, your company will convey to our subsidiaries, all of the outstanding stock of one of your subsidiaries for a proportionate part of the purchase price [of $2,500,000]."

\* \* \*

"From your standpoint, the transaction will simply entail your sale of all of the stock of your subsidiaries for the purchase price [of $2,-500,000] \* \* \*."

\* \* \*

This letter must be read in the light of the "standard form" of contract which was enclosed with the letter, and which defendant stated it proposed to use in completing the transaction. Consistent with the letter, paragraph 1 of the "standard form" contract recited that North American Finance Corporation, a Pennsylvania corporation, agreed to purchase and plaintiff agreed to sell —— shares of capital stock of Interstate Loan Company, a Pennsylvania corporation, for "the aggregate purchase price of $——,". By paragraph 7 plaintiff agreed that it would not, for a period of three years, engage in the business of making loans in the amount of $600 or less under the provisions of the laws of Pennsylvania or New Jersey in certain specified areas.

When plaintiff read the letter of August 30 and the enclosed "standard form" of contract, it was justified in understanding that defendant was proposing that plaintiff should receive and the subsidiaries of defendant should pay $2,-500,000 as the price of the stock of the four loan companies, and that no monetary consideration should be ascribed to the covenant not to compete by any party. This conclusion is not weakened by the statement in paragraph 7 that the covenant was to be "a material part of the consideration for [the] contract." This provision did not suggest that the parties were to assign a monetary value to the covenant. The making of the contract by each of the purchasing subsidiaries in and of itself would be sufficient consideration to support plaintiff's covenant.

Indeed, no part of the monetary consideration could be treated as a *quid pro quo* for the covenant, without a *pro tanto* diminishment of the $2,500,000 which the defendant, both in its letter and "standard form" of contract, expressly stated was to be the purchase price of the stock.

This undertanding that $2,500,000 was to be the price of the stock was not changed by the four documents executed on September 20, 1956. In two of them, paragraph 7 was substantially the same as paragraph 7 of the "standard form", and in all of them the dollar consideration was specified to be the "purchase price" of the stock. In the four documents this totaled the $2,500,000.

The final paragraph of defendant's letter of August 30, 1956 is no less important in its income tax implications. There, defendant purported to advise plaintiff of its proposed action after the closing, stating:

"While we realize your company is not concerned with our procedures after completion of the purchase of this stock, we felt you might be interested in knowing that after the purchase, our subsidiaries will liquidate and dissolve the corporations which they have acquired under the provisions of Section 334(b) (2) of the Internal Revenue Code. This procedure is necessary since our purpose in this purchase is to acquire the loan contract of your subsidiaries rather than their stock. Following this liquidation and in line with our corporate policy of having each office a separate corporation, we will form additional subsidiaries in Pennsylvania and New Jersey, each of which will acquire the assets of one office."

This last paragraph is significant in two respects. First, defendant stated that plaintiff was not concerned with defendant's procedures after the sale had been completed. This statement implied that defendant would do nothing after the sale which would becloud the right of plaintiff to treat the entire $2,500,000 as

the sales price of the stock. For if plaintiff were not able to do this, and were forced to treat part of the $2,500,-000 as ordinary income, the consequences would be grave. Plaintiff and its subsidiaries owed the banks about $6,000,-000. It was because the banks had notified plaintiff that the loans would be called at the end of the year that plaintiff was selling the stock of its loan companies. Defendant was aware that plaintiff was involved with the banks and needed about $7,000,000.[5] Consequently, when defendant said that the plaintiff was not concerned with its subsequent procedure, plaintiff had every right to understand that the defendant was not contemplating any action which would jeopardize plaintiff's right to treat the entire $2,500,000 as the selling price of the stock in reporting the transaction to the tax authorities.

Williams, executive vice president and general counsel of defendant, testified that the last paragraph of the letter of August 30, by referring to defendant's plan to have its subsidiaries liquidate the loan companies under Section 334(b) (2) of the Int.Rev.Code of 1954, had the effect of putting plaintiff on notice that defendant might assign part of the $2,500,000 as the cost of the covenants. This is far-fetched, to say the least.

Section 334(b) (2) provides that when a qualified corporation (as were defendant's purchasing subsidiaries) liquidates a company whose stock it has acquired, "the basis of the property in the hands of the distributee shall be the adjusted basis of the stock with respect to which the distribution was made." This means that when the subsidiaries of defendant liquidated the loan companies, the assets of the latter would have a cost basis to the distributees equal to the price which the distributees had paid for the stock.

This disclosure which defendant made of its future plans and its reference to

Section 334(b) (2) of the Int.Rev.Code provided plaintiff with no clue that the defendant intended to have its purchasing subsidiaries treat only part of the monies paid to plaintiff as the purchase price of the stock which they were acquiring, and that they would assign the remainder of the monies to the cost of the covenant. Nor can any such intention be gleaned from defendant's statement in its August 30 letter that it was interested primarily in acquiring the loans receivable owned by the loan companies, and that it had no interest in acquiring their stock as such.

Since at the time when Williams wrote the letter of August 30 he had in mind claiming that part of the dollar consideration was the cost of the covenant, it behooved him to make that intention known to plaintiff in so many words. Certainly what was said in the letter was inadequate to convey any such impression.

Plaintiff's rights in this litigation do not depend upon defendant's representation in its August 30 letter that it had been advised by its counsel that from plaintiff's standpoint the transaction would constitute the sale of capital assets taxable at a maximum of 25%. Plaintiff did not rely upon this opinion. Plaintiff showed the letter of August 30 and the attached "standard form" of contract to its own lawyer and was told that it would have a tax of 25% on its profit of approximately $2,250,000.[6] Plaintiff relied upon the advice of its own lawyer. But this advice was necessarily based upon the transaction disclosed in the "standard form" contract and defendant's letter of August 30, 1956. From these, plaintiff's lawyer was justified in concluding that both parties intended that the $2,500,000 was to be the price paid for the stock of the four loan companies and for nothing else.

On April 18, 1961, the Internal Revenue Service, which had previously ac-

---

5. The tax deficiency which was asserted against plaintiff with interest came to over $400,000. If the case had been lost, plaintiff would have been insolvent. (R. 138.)

6. This is computed by deducting from the sales price of $2,500,000 of the stock, its cost of $250,000.

cepted without protest plaintiff's capital gains treatment of the transaction, advised plaintiff that it was reopening its return. This, it said, was because

> "the purchasers of certain of these capital stocks treated a portion of the purchase price as a payment for covenants not to compete. * * * thus creating an inconsistency in the position taken regarding the sale as between the purchaser and the seller (Stern & Co.).

> "Since similar treatment must be afforded to both parties to the transaction it will be necessary that this office reopen our examination of your 1956 return and treat a portion of the profits realized by your company from the sale of the capital stock reported therein as ordinary income derived from the sale of covenants not to compete.[7]

Defendant should have known that its contention that a part of the money paid to plaintiff represented the cost of the covenant not to compete, was irreconcilable with plaintiff's treatment of the entire consideration as the sales price of the stock; and that the allowance of the tax benefits which defendants sought would, in all likelihood, result in the disallowance of the capital gains benefits to plaintiff. The two positions were logically inconsistent. See 3B Mertens, Law of Federal Income Taxation, § 22.33, p. 149 (1958 ed.); Note, 67 Yale L.J. 1261, 1263 (1957).

This conclusion is not negatived by the fact that the asserted tax deficiency against plaintiff was dismissed by stipulation, while at the same time the Government, allowed defendant's subsidiaries to amortize 25% of the amount by which their payment to plaintiff exceeded the book value of the assets of the loan companies. This latter action was the result of a stipulated settlement, and may well have reflected the Government's acceptance in whole or in part of an alternative argument that the defendant urged which was supportable without reference to the covenant not to compete.[8]

A promise necessarily implied in a contract is as much a part thereof as a promise plainly expressed. Jacobs v. Kraft

7. The position of the Government in its tax cases against plaintiff and one of defendant's subsidiaries, North American Finance Corporation of Chester, was succinctly stated by counsel for the Government: (PX 25 3–4)

> "It is [the Government's] position that if the sum of $1,218,742.80 was received for a covenant not to compete, then Chester is entitled to a deduction for amortization of a portion thereof and that amount constitutes ordinary income to the petitioner in the Stern case.

> "By the same token, if the sum was received for capital assets, then Chester is not entitled to a deduction for amortization, and the petitioner herein, Stern, will be entitled to capital gain treatment."

8. Under the alternative argument, defendant contended that $1,218,742.80 was the amount by which the total consideration paid to plaintiff exceeded the book value of the assets of the loan companies, and that this excess should be allocated to the loan accounts of the loan companies. See R.63–66. Section 334(b) (2) required defendant and its subsidiaries which purchased the stock of the loan companies to allocate the purchase price of the stock to the assets of the loan companies, following their distribution on liquidation. See Treas.Reg. § 1.334–1(4) (viii). Upon the theory that the loan accounts had a loan life of five years (R.64–65), defendant argued that they were amortizable over a five year period. See Treas.Reg. § 1.167(a)–3. This alternative argument of defendant's was consistent both with plaintiff's capital gains treatment of the transaction and with Section 334(b) (2), since the $2,500,000 which plaintiff claimed to be the purchase price which it received for the stock of the loan companies was allocated to their assets following their liquidation.

The Government contended that the difference between the $2,500,000 which plaintiff received and the lesser book value of the assets of the loan companies constituted good will which was not amortizable. This contention was not prejudicial to plaintiff since good will is a capital asset, subject to capital gains treatment. 3B Mertens, Law of Federal Income Taxation, § 22.50, p. 205 (1958 ed.)

Cheese Co., 310 Pa. 75, 164 A. 774, 776 (1933). In the absence of a provision to the contrary, the law will imply an agreement by each party to refrain from doing anything that will destroy or injure the other party's right to receive the fruits of the contract. Van Campen Corp. v. Building and Construction Trades Council, 202 Pa.Super. 118, 195 A.2d 134, 136–137 (1963).

Construing the letter of August 30, the memorandum of September 7, and four documents of September 20, 1956, as an integral part of the contract between the parties, the conclusion is warranted that defendant impliedly agreed that neither it nor its subsidiary would do anything to jeopardize plaintiff's right to treat the entire $2,500,000 which it received as the selling price of the stock of the loan companies. The action which the defendant and its subsidiaries took before the I.R.S. and in the Tax Court was a violation of this implied agreement. The expenses, including attorneys' fees, which the plaintiff incurred in successfully maintaining its position before the Tax Court, resulted from the breach by defendant of its implied obligation. Defendant must, therefore, respond in damages for the reasonable expenses which plaintiff incurred.

Lentz, a partner of White and Williams, the Philadelphia law firm which was employed by plaintiff to represent it in the tax controversy, testified in detail as to the nature of the services which were rendered. Young, of Stradley, Ronan, Stevens and Young, another firm of Philadelphia lawyers, and Lentz each testified that the attorneys' fees which plaintiff paid were reasonable. Both were eminently qualified to express an opinion on the subject. Their testimony was not contradicted and is accepted.

Plaintiff is not, however, entitled to recover punitive damages. It is the law of Pennsylvania, Hoy v. Gronoble, 34 Pa. 9, 11 (1859), as it is generally, Restatement, Contracts, § 342 (1932); 5 Williston on Contracts, § 1340 (Rev. ed.); 5 Corbin on Contracts, § 1077 (1964 ed.) that punitive damages may not be recovered for breach of contract except in an action for breach of promise to marry.