N. Ray TIPTON and Fred R. Lawson, Plaintiffs-Appellees,

v.

Charles P. WOODBURY, Defendant-Appellant.

No. 78–2595.

United States Court of Appeals, Fifth Circuit.

April 30, 1980.

Roark & Roark, George J. Roark, Jr., G. James Roark, III, Pensacola, Fla., for defendant-appellant.

Holsberry, Emmanuel, Sheppard & Condon, Patrick G. Emmanuel, Pensacola, Fla., for plaintiffs-appellants.

Before COLEMAN, Chief Judge, PECK * and KRAVITCH, Circuit Judges.

PER CURIAM:

The decision appealed from is AFFIRMED on the basis of the Memorandum Decision by the Honorable Winston E. Arnow, Chief Judge, Northern District of Florida, filed on July 13, 1978, and attached hereto as an Appendix.

AFFIRMED.

## APPENDIX

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

N. RAY TIPTON and FRED R. LAWSON,

Plaintiffs,

vs.                                                                 PCA NO. 77–0512

CHARLES P. WOODBURY,

Defendant.

------------------------------------------------------------------------

## MEMORANDUM DECISION

This is a suit for specific performance of an alleged contract in which the defendant agreed to sell all his stock in the Bank of Pensacola, 22,330 shares, to the plaintiffs for $457,675. Plaintiffs Tipton and Lawson are citizens of Virginia and Tennessee, respectively; the defendant is a citizen of Florida. Since there is complete diversity among the parties, this court has jurisdiction over the subject matter under 28 U.S.C. § 1332.

Briefly, the plaintiffs allege that on January 25, 1977, the parties entered into an oral contract for the purchase of the defendant's stock. The defendant denies that an agreement of sufficient certainty to constitute a binding contract was ever reached. In addition, since the transaction in issue constitutes a sale of investment securities as that term is defined by F.S.A. § 678.8–102, it is governed by the provisions of the Uniform Commercial Code (UCC), F.S.A. Chapters 671–680; therefore, the contract cannot be enforced unless it is evidenced by a writing sufficient to satisfy § 678.8–319, the Statute of Frauds provision in Article 8.

The plaintiffs contend that two letters sent to the defendant, one by Lawson on

* Circuit Judge of the Sixth Circuit, sitting by designation.

April 18, 1977, and the other by Tipton on April 20, meet the requirements of § 678.8–319(3) and thus circumvent any barrier posed by the statute. The defendant maintains the letters do not comply with that section's requirements that they be sent "[w]ithin a reasonable time," and that they be sufficient against the sender.

The case was tried before the court without a jury on July 5, 1978. Having completed its review of the evidence presented at trial, briefs of counsel and all other relevant material, the court now finds the plaintiffs have satisfied the requirements necessary to prove both the existence of a contract and its subsequent breach and, therefore, are entitled to judgment in their favor.

I

Sometime in 1975, Fred R. Lawson and his brother, N. Ray Tipton, decided to jointly purchase the controlling interest in a bank. Neither man is a stranger to the banking business: Mr. Lawson is president of the Blount National Bank of Maryville, Tennessee, and Mr. Tipton is one of the bank's directors; Mr. Tipton is also a director of the Dominion National Bank in Richmond, Virginia. During the fall of that year they learned that Charles P. Woodbury, owner of a majority interest in the Bank of Pensacola, was interested in selling his stock. Mr. Woodbury, too, is no stranger to the banking business, having been a banking executive in the Pensacola area for over twenty years. Tipton and Lawson thus made contact with Mr. E. Allen Brown, the president, and a director, of the Bank of Pensacola. In addition, Mr. Brown is the executive director of the Five Flags Affiliate Banking Group of which the Bank of Pensacola is a member. From the moment of his first contact with the plaintiffs, Brown served as a conduit between the parties; however, all parties were aware that Brown had no authority to enter into any agreements for the defendant.

Preliminary negotiations, primarily in the form of letters and calls between Brown and Lawson, were conducted throughout 1976. Toward the end of that year the plaintiffs met with Woodbury and confirmed that he did, indeed, own the controlling interest in the bank. Nothing else was then agreed upon. Sufficient negotiations had been conducted, however, to allow the plaintiffs to again meet with the defendant to try to reach an agreement to purchase his stock. Lawson and Brown thus arranged a meeting for January 25, 1977 in Pensacola at Woodbury's office. Present were Lawson, Tipton, Woodbury and Brown.

This meeting was keyed to an effort to settle on a fair price for the stock. Various proposals were put forth, and the parties finally shook hands on an agreement whereby the plaintiffs would purchase all of Woodbury's stock—the exact amount, although known to be majority, was unclear—for $20.50 per share. Furthermore, the plaintiffs agreed to purchase the stock of any other shareholder who wished to sell at that price. The parties agreed plaintiffs might conduct an audit of the bank's assets to satisfy themselves respecting value. Defendant asked the plaintiffs to wait until he authorized a date and plaintiffs consented.

After the purchase agreement was reached, the discussion turned to other matters relating to the operation of the bank, and the parties then resolved the following matters: the plaintiffs would bring in their own man as president and Jim Durr, the executive vice-president, would move to the Navy Bank, another member bank of the Five Flags group; all other management personnel at the Bank of Pensacola were free to remain in their positions; the board of directors for the Bank of Pensacola were also free to remain in office although the plaintiffs planned to appoint some additional members; and the plaintiffs were free to decide whether to continue the affiliation with Five Flags and a related computer service. These matters were collateral to, and not integral parts of, the contract made for the sale of the stock.

Although it was understood that payment for the stock would be in cash, no specific arrangements were made for the actual

transfer of funds. The primary reason for this omission was Woodbury's statement—accepted by the plaintiffs—that no written agreement could be signed, and no transfer made, until the plaintiffs received approval from the Florida Comptroller for the purchase of the bank.[1] Woodbury also gave this as his reason for declining the plaintiffs' offer to put up earnest money for the sale. Finally, the parties discussed the actual application. Lawson told Woodbury that he was a personal friend of the Tennessee Comptroller and thus anticipated no difficulty in obtaining approval for the sale. The plaintiffs were then prepared to begin immediate pursuit of that approval, but were stopped by Woodbury who informed them that before he went through with the sale he wished to speak with some other stockholders and solicit their approval. If everything was acceptable, Woodbury would direct Brown to call the plaintiffs and give them the go-ahead for the deal. The plaintiffs agreed.

Several days later Woodbury called Brown and told him to call Lawson: Everything was acceptable and the plaintiffs could proceed. Brown then called Lawson, and at that point Woodbury was committed to the sale—a sale that the plaintiffs could fairly expect to be consummated upon approval of their application. The plaintiffs

then wrote to Tallahassee for the necessary forms and, upon receipt, forwarded them to Brown so that he could furnish certain information.[2] Brown did so and returned the forms. The plaintiffs then completed their application, and Lawson called Brown to read the completed forms for his verification.

The plaintiffs flew to Tallahassee to personally file their application—and pay the $2,000 filing fee—February 17, 1977. While in Tallahassee the plaintiffs met with Mr. Fred Brennan of the comptroller's office. Brennan informed them that the comptroller had ninety days to either approve or disapprove the application; however, if no action had been taken by the end of that time, approval was automatic. Brennan also assured them that he would move as quickly as possible and that something might be done within six weeks. Regardless of any action on Brennan's part, however, the law provided that the plaintiffs would have a definite answer by May 18, 1977—ninety days from the date of filing. Shortly thereafter Tipton informed Woodbury and Brown of the plaintiff's discussions with Brennan.

On several occasions during the following six weeks, Woodbury, becoming increasingly anxious for some action, directed Brown

1. In this respect the parties—actually the defendant since the plaintiffs relied on his representations—were mistaken. F.S.A. § 659.14 provides that when a person or group of persons proposes to acquire the majority of the outstanding capital stock of any state bank, "such person shall first make application to the commissioner for a certificate of approval" that shall be issued only after the commissioner is satisfied that the proposed owners are qualified "by character, experience, and financial responsibility" to control the bank in a proper manner that will not jeopardize the interests of "the stockholders, depositors and creditors of the bank" and the interests of the public. The statute itself contains no language that proscribes the parties to a sale from reaching an agreement, written or otherwise, prior to filing an application. Moreover, the application itself indicates that an agreement, if anything, is a prerequisite to filing: It requires a notarized statement that the applicants "have agreed and offered to purchase and *hereby confirm their agreement to purchase all of the outstanding capital* stock . . . at the option of every

shareholder . . . at the same price or consideration paid for any of the stock purchased in connection with the acquisition of the majority interest . . . ." The applicant must also furnish the price to be paid for the majority stock. Further, the Florida courts have interpreted the statute to mean that not only can an applicant enter into an agreement to purchase prior to filing, but the parties can begin the actual stock transfer so long as the transferee does not obtain a majority interest prior to receiving approval for the sale. *Interbay Citizens Bank of Tampa v. Weaner*, 311 So.2d 835 (Fla.App.1975). Nevertheless, since the parties acted on the assumption that no written agreement was permissible, the court must evaluate their subsequent acts as though that assumption were correct.

2. The information received included the fact that the defendant's exact holdings were 22,330 out of a total of 39,000 shares of outstanding stock.

to call Lawson and check on the status of the application. In response, Lawson would call the comptroller's office. Each call produced a similar result. Lawson was told his application was still pending and nothing could be done to expedite the matter. Neither Woodbury nor Brown ever called the comptroller's office or did anything to speed matters along. Suddenly, around the last Thursday in March, Woodbury directed Brown to call Lawson and tell him "to get it together by Monday or else." Lawson then called Tipton who called Woodbury to arrange a meeting to discuss the situation. The parties agreed to meet April 15, in the office of Bert Lane, a Pensacola attorney who had represented both Tipton and Woodbury on prior occasions. On April 13, Woodbury asked Lane to draft a written agreement for this sale. His proposal contained three terms that had not been part of the January 25 agreement: a price of $21.50 per share, a $39,000 option payment that would be forfeited if there was no approval by the comptroller or the sale otherwise did not go through, and a deadline for "closing" the deal. Lane drafted a letter in accordance with those terms, and Woodbury presented it to the plaintiffs at the April 15 meeting.

The meeting was attended by Lawson, Tipton, Brown, Woodbury and Lane. Prior to their arrival in Pensacola, the plaintiffs received permission from the defendant to bring an auditor with them to perform the audit agreed to at the January 25 meeting. This audit was performed at the bank while the parties conducted their meeting. Everything was found to be in order.

The only product of the April 15 meeting was bitter acrimony between the parties. Woodbury contended that the other stockholders were concerned about the delay in getting approval, and that the $39,000 could

be considered "interest" on their money.[3] In response the plaintiffs offered to pay some money over the contract price to compensate for the delay; however, it was also their position that they were under no obligation to do so. A figure of $20,000 was discussed without agreement. As a possible alternative, and to demonstrate their good faith, the plaintiffs offered to place in escrow enough money to pay for all the outstanding stock. Additionally, the money would be placed in a savings account with the resulting interest to be divided among the shareholders. Woodbury refused. Ultimately, the plaintiffs took the position that any change in the initial contract would necessitate filing a new application with the comptroller leading to only greater delay, and, thus, they would stand on the original agreement. Woodbury then said, "It's over"; there was no agreement. The meeting broke up, in Lane's words, with "a lot of animosity."

Three days later, on April 15, Lawson sent Woodbury a letter, the purpose of which was "to confirm [the January 25 agreement] that my brother and I will purchase your 22,330 shares of Bank of Pensacola stock for the sum of $20.50 per share, all per our standing agreement to that effect." Tipton then sent Woodbury a similar letter on April 20, in which he stated that "you agreed in January 1977 to sell your interest in the Bank of Pensacola . . . to my brother and myself for $20.50 per share . . . ." The letter concluded by advising Woodbury that the plaintiffs "propose to close the sale in accordance with our understanding as soon as the comptroller's permission is obtained." These letters were sent so that the plaintiffs could have something in writing "even if he [Woodbury] did object."

---

**3.** Respecting "interest," it does not appear to this court there was reasonable basis for a claim of interest for the period. The stock paid no dividends, there was no other offer, according to the defendant, made for its purchase during the period, nor was there showing of increase in its value during the period. While the parties wanted to consummate the pur-

chase promptly, there was no agreement that such be done within a particular time, and the delay was not plaintiffs' fault. That plaintiffs were willing, nonetheless, to participate in negotiations respecting changed terms and increased price is further evidence of their good faith dealing.

Woodbury passed the letters on to Brown with directions to show them to Lane. Lane and Woodbury conferred and decided that no response would be necessary. No response, then, was ever sent.

On May 18, 1977, the comptroller issued to the plaintiffs their Certificate of Approval. The certificate and an accompanying letter were mailed May 20. On June 1, 1977, Lawson wrote Woodbury to inform him that the certificate had been received and that, on June 20, the plaintiffs would have $457,765 at the office of Joseph S. Crona, the president of the Century Bank of Pensacola, Florida, to "consummate the transaction." Woodbury responded with a letter to Lawson on June 6, 1977, stating, "We certainly do not have any agreement," and, further, that Lawson would be "wasting" his time "to escrow any funds with any bank." Nevertheless, the plaintiffs placed their money with the Century Bank; the defendant did not tender his stock.

At all times since June 20, 1977, the plaintiffs have been, and are, ready, willing and able to perform.

### II

The first issue to be confronted is whether the letters of April 18 and 20 satisfy the Statute of Frauds. The relevant portion of § 678.8–319 provides:

A contract for the sale of securities is not enforceable by way of action or defense unless:

(1) There is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price; or

. . . . .

(3) Within a reasonable time a writing in confirmation of the sale or purchase and sufficient against the sender under subsection (1) has been received by the party against whom enforcement is sought and he has failed to send written objection to its contents within ten days after its receipt.

Without doubt the letters satisfy subsection (1). They contain all three required elements: a stated quantity ("22,330" by Lawson; "all" by Tipton) of described securities (shares of Bank of Pensacola stock) at a stated price ($20.50 per share).[4] *Alderson v. Francis I. duPont & Company*, 251 So.2d 710 (Fla.App.1971). There is no dispute that the defendant failed to send a written objection within ten days after its receipt. There remains, however, the question whether the letters were sent within a reasonable time.

Questions of this sort are not decided in a vacuum: Article 1 of the Code, F.S.A. § 671, contains the general provisions that are applicable to all portions of the Act. Two such provisions are especially relevant here. F.S.A. § 671.1–203 provides that "[e]very contract or duty within this code imposes an obligation of good faith in its performance or enforcement." The court finds that the plaintiffs acted in good faith throughout the entire course of their dealings with the defendant. F.S.A. § 671.1–204(2) provides that "[w]hat is a reasonable time for taking any action depends on the nature, purpose and circumstances of such action." Considered in light of this definition, the letters were sent within a reasonable time.

Nothing was put in writing at the January 25 meeting because the defendant implied that it was not proper to do so. The plaintiffs acted on this belief. Every condition and obligation imposed upon the plaintiffs was met in good faith. They did all they promised to do. Under these circumstances there was no reason why any letters would have been sent during the period January 25, 1977—April 15, 1977. At the April 15 meeting, a writing was produced for the first time—a letter, or draft agreement, constructed at Woodbury's request

---

4. Although the court finds that the letters satisfy the provision standing alone, they may also be considered in conjunction with one another.

*Phillips v. Zimring*, 284 So.2d 233 (Fla.App. 1973).

that contained terms materially altering the parties' prior agreement. The defendant changed the rules; the plaintiffs responded. They did so in order to preserve their version of the original agreement and to counter the sudden shift in position. They acted in good faith. The letters were thus sent within a reasonable time as contemplated by §§ 671.1–204(2) and 678.8–319(3).

## III

■ As the comments to F.S.A. § 672.2–201(2)[5] make clear, the only effect in finding that the Statute of Frauds has been satisfied "is to take away from the party who fails to answer the defense of the Statute of Frauds; the burden of persuading the trier of fact that a contract was in fact made orally prior to the written confirmation is unaffected." Thus, there remains the issue whether the plaintiffs can demonstrate that the parties had entered into a binding contract.

■ One important difference exists between proving the existence of an oral contract under the UCC and proving one under Florida common law. Oral contracts outside the UCC must be proved by more than a preponderance. The test is "clear, full and free from suspicion." *Sultan v. Jade Winds Construction Co.*, 277 So.2d 574, 576 (Fla.App.1973). The test for contracts that fall within the UCC is simply a preponderance of the evidence:

> Florida courts have never directly addressed the question of the burden of proof required for the recognition of oral contracts covered by the UCC; *Sultan* [does] not control the determination of this issue. In adopting the UCC, the Florida legislature apparently intended to adopt a preponderance standard for cases covered by the Code. In section 671.1–201(8) the 'burden of establishing' a fact is defined as 'the burden of persuading the triers of fact that the existence of the fact is more probable than its non-existence.' As Sam G. Harrison, Jr., explains

in the Florida Code Comments to section 671.1–201(8), this wording apparently intends to establish 'the burden of ultimate persuasion' by a preponderance of the evidence. The sections on oral agreements indicate no intention to deviate from the general standard.

*Transammonia Export Corporation v. Conserv, Inc.*, 554 F.2d 719 (5th Cir. 1977).

Article 8 does not provide any guidelines for determining the essential elements of a contract for the sale of investment securities. Once again, however, the decision is not made in a vacuum; there are factors that can be considered both within the code and in Florida contract law. The comments to F.S.A. § 672.2–105, the section that defines the essential elements of "goods" as that term is used in evaluating contracts for sale under the UCC, state:

> "Investment securities" are expressly excluded from coverage of this Article. It is not intended by this exclusion, however, to prevent the application of a particular section of this Article by analogy to securities . . . when the reason of that section makes such application sensible and the situation involved is not covered by the Article of this Act dealing specifically with such securities (Article 8).

Courts have not been reluctant to follow this invitation and have on numerous occasions used the terms in Article 2 to construe Article 8 contracts. *See, e. g., Kroeze v. Chloride Group Ltd.*, 572 F.2d 1099 (5th Cir. 1978) (diversity case applying Florida law); *Bache & Co., Inc. v. International Controls Corp.*, 339 F.Supp. 341 (S.D.N.Y.1972) (New York law); *Stern & Co. v. State Loan and Finance Corporation*, 238 F.Supp. 901 (D.Del.1965) (diversity case applying Pennsylvania law). The court finds this an appropriate case in which to follow suit.

■ F.S.A. § 672.2–204, governing the formation of contracts in general, provides:

---

**5.** This is the Statute of Frauds provision found in Article 2, governing the sale of goods and is a companion statute to § 678.8 319.

(1) A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.

(2) An agreement sufficient to constitute a contract for sale may be found even though the moment of its making is undetermined.

(3) Even though one or more terms are left open a contract for sale *does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy.*[6] [Emphasis added.]

Applying that section to this case, the court finds that the parties had a valid contract from the time Brown told Lawson to file his application.

Certainly the conduct of the parties reveals a contract. On January 25, 1977, they met after more than a year of preliminary negotiations to work out an agreement. They settled on the price and other essential terms and shook hands on the deal. Woodbury then told the plaintiffs he wanted to talk to the other stockholders and, if everything was satisfactory, he would give them the go-ahead. At that point he could have put an end to the entire deal or else sought to renegotiate it. This he did not do. Rather, he told Brown to call Lawson and thereby set the wheels in motion. From then on, the plaintiffs did all that was required of them.

Turning to the terms of the contract, the court finds that they are all present: price, quantity and a sufficient description of the stock itself. All the collateral arrangements pursuant to the actual operation of the bank itself were also settled. The parties knew payment was to be in cash. The only missing term was time and place of payment, and that term could not be supplied until after the certificate was obtained. Furthermore, it was not, and is not, a difficult question to resolve. Obviously, the

parties contemplated they would proceed with consummation promptly after comptroller approval was obtained, and that plaintiffs were ready, willing and able to do.

Finally, the court finds that this result is consistent with Florida contract law. Florida courts have held that "a contract should not be held void for uncertainty unless there is no other way out, and 'indefiniteness must reach the point where construction becomes futile.' " *Innkeepers International, Inc. v. McCoy Motels, Ltd.,* 324 So.2d 676 (Fla.App.1976). *See also Blackhawk Heat & Plumbing Co., Inc., v. Data Lease Fin. Corp.,* 302 So.2d 404 (Fla.1974). Under these principles, given the number of terms not in dispute and the conduct of the parties, the result would be the same.

The parties have stipulated that, if plaintiffs recover, the appropriate remedy is specific performance.

Defendant, citing *Scott v. Anchor,* 282 So.2d 640 (Fla.App.1973), contends a greater degree of proof than that required under the preponderance of evidence rule is necessary for the granting of specific performance.

The decision does set forth this test: Moreover, the granting of a final decree in a specific performance suit requires that the proof be clear, competent and satisfactory.

The decision did not mention nor concern itself with the provisions of the UCC. The Uniform Commercial Code is an integrated comprehensive treatment of a single body of law, and the text of each section should be read in the light of the purpose and policy of the Code as a whole. The Code must be considered as a whole, and each section should be read in conjunction with others in order to ascertain the intent of the legislature. 15A Am.Jur.2d, *Commercial Code,* § 19.

---

**6.** The question of intent—both under the UCC and under Florida contract law—is answered by looking at the *objective* intent: what the parties said and did and not what they might have subjectively thought. *Blackhawk Heating*

*& Plumbing Co., Inc. v. Data Lease Financial Corp.,* 302 So.2d 404 (Fla.1974). Thus the court must concern itself with what the defendant actually said and did and not with whatever mental reservations he might have had.

As adopted in Florida the Code applies the preponderance of evidence rule to transactions within its scope. Some of its sections refer to specific performance as a remedy. The reference to such is found in § 672.2–711, and specific performance is also dealt with in § 672.2–716. The comment under this latter section points out that "this Article seeks to further a more liberal attitude than some courts have shown in connection with the specific performance of contracts of sale." To this court, under the construction to be given this Code, and with these sections read together, the proof required, both to establish a contract and specific performance as an appropriate remedy, is only that shown by the preponderance of evidence.

In any event, however, the proof of the contract in this case and of its breach by defendant, is clear, competent and satisfactory, and the court so finds.

Judgment will be entered in favor of the plaintiffs and setting forth an appropriate remedy.