**EXCESS RISK UNDERWRITERS, INC. a Florida corporation, Plaintiff,**

v.

**LAFAYETTE LIFE INSURANCE COMPANY, an Indiana corporation, Defendant.**

No. 01–4111–CIV.

United States District Court, S.D. Florida.

May 3, 2004.

George Wentz, Esq. & Matthew Kish, Esq., Coral Gables, FL, for Plaintiff.

Richard C. Smith, Esq., & Stephen Darmody, Esq., Miami, FL, for Lafayette Life Ins.

### AMENDED SUMMARY JUDGMENT ORDER

GOLD, District Judge.

THIS CAUSE is before the Court upon the following motions for partial summary judgment filed by the parties in this matter: Defendant Lafayette Life Insurance Company's ("LLIC") motion for partial summary judgment upon Counts Ten and Twelve of Third Amended Complaint [DE 225], filed September 19, 2003; LLIC's motion for partial summary judgment on Count Five [DE 223], filed September 18, 2003; Plaintiff Excess Risk Underwriters, Inc.'s ("ERU") motion for partial summary judgment as to Count Four [DE 226], filed September 19, 2003; ERU's motion for partial summary judgment as to Count Seven [DE 227], filed September 19, 2003; and ERU's motion for partial summary judgment as to Count Six [DE 217], filed September 10, 2003. This cause is also before the Court upon ERU's Motion to Strike, for Protective Order, and for Fees and Costs [DE 244], filed October 10, 2003.

The Court held oral argument on these motions on January 16, 2004. Upon a review of the parties' arguments, the record, and the relevant case law, the Court concludes as follows: Defendant LLIC's motion for partial summary judgment as to Count Five is GRANTED; LLIC's motion for partial summary judgment as to Counts Ten and Twelve is GRANTED IN PART AND DENIED IN PART. Plaintiff ERU's motion for partial summary judgment as to Count Four is DENIED; ERU's motion for partial summary judgment as to Count Six is GRANTED; ERU'S motion for partial summary judgment as to Count Seven is DENIED.

### FACTS [1]

This case concerns a dispute between two insurance companies-one company that primarily administers insurance policies and one company that primarily writes insurance policies. Plaintiff Excess Risk Underwriters, Inc. ("ERU") is a Florida corporation licensed and authorized to do business in the State of Florida; ERU is primarily an administrator of insurance. (Third Amnd. Cmpt. ¶ 2). Insurance administrators handle all of the paperwork associated with the issuance of insurance policies and claims made under those policies. (Third Amnd. Cmpt. ¶ 7). Defendant Lafayette Life Insurance Company ("LLIC") is an Indiana corporation that primarily writes and carries insurance policies, meaning that LLIC assesses the risk and covers at least a percentage if not all of the risk on an insurance policy. (Third Amnd. Cmpt. ¶ 3).

---

1. The following facts are derived from the Plaintiff's Local Rule 7.5 statements, the Defendant's Local Rule 7.5 statements, and the exhibits attached thereto. Because the parties filed different statements of fact with each motion for summary judgment, the Court shall note from which motion a fact is taken. Certain non-material background facts are derived from the Plaintiff's Third Amended Complaint and from clarification of those facts by the parties at Oral Argument. Any factual disputes between the parties are so noted.

The dispute between ERU and LLIC began when American Bankers Life Assurance Company of Florida ("ABLAC"), a life insurance company in the business of issuing insurance policies, determined that it no longer desired to issue a certain type of group life insurance policy. ABLAC contacted ERU to take over administration of certain ABLAC insurance policies, and ABLAC contacted Swiss Re Life Insurance Company ("Swiss Re") to act as reinsurer while ABLAC sought a replacement insurer. Generally speaking, a reinsurer is a party that agrees to cover and pay some percentage of the risk, apportioned between the reinsurer and the insurer. Eventually, LLIC was selected as ABLAC's replacement insurer and certain of ABLAC's policies were transferred to LLIC. The terms under which these policies were transferred and the subsequent administration of these and other policies, in part, constitute the subject of this lawsuit.

*The Governing Agreement between ABLAC, ERU, and Swiss Re*

ABLAC, ERU, and Swiss Re entered into a contract which became effective on January 1, 1997 and which was entitled the "Governing Agreement" between the parties. (SJ Count 5, Def's 7.5 Stat. ¶ 1). The stated purpose of the Governing Agreement was to document ABLAC's retention of ERU as an administrator for certain of ABLAC's group insurance policies which would be reinsured by Swiss Re, and to authorize ERU to locate a replacement insurer to take over the policies. (SJ Count 5, Def's 7.5 Stat. ¶ 6). ABLAC had the unconditional right to decline renewal or to cancel the insurance policies beginning in 1998. (SJ Count 5, Def's 7.5 Stat. ¶ 6). The Governing Agreement's Addendum Number 1 provides that ERU was authorized to contract with one or more life insurance carriers in order for ERU to continue to write new insurance business for new and existing groups after September 30, 1997. (SJ Count 5, Def's 7.5 Stat. ¶ 18). It states that "replacement of risks identified herein shall be contingent upon and subject to the provisions of this Agreement ...." (SJ Count 5, Plaintiff's 7.5 Stat. ¶ 8). The Governing Agreement also contains a broad form, mandatory arbitration clause. (SJ Count 5, Def's 7.5 Stat. ¶ 20).

The Governing Agreement was signed by Sandy Neubarth for ABLAC, Steve Cullen for ERU, and Paul Whalen for Swiss Re. (SJ Count 5, Def's 7.5 Stat. ¶ 2). LLIC was not a party to and did not sign the Governing Agreement. (SJ Count 5, Def's 7.5 Stat. ¶¶ 4, 5).

ERU contends that LLIC was made aware of the existence of the Governing Agreement and its general contents by Swiss Re prior to LLIC contacting ERU in October 1997 to discuss LLIC becoming the replacement carrier of the ABLAC block. (SJ Count 5, Plaintiff's 7.5 Stat. ¶ 1). Specifically, ERU contends that Robert Dube, head of group insurance for LLIC in November 1997, reviewed the Governing Agreement with Martin Cullen of ERU prior to executing an agreement between ERU and LLIC on November 13, 1997 (the "ERU–LLIC Agreement" or the "ERU–LLIC Agreement of November 1997"). (SJ Count 5, Plaintiff's 7.5 Stat. ¶ 2; Def's 7.5 Stat. ¶ 14). LLIC contends that it was never asked to sign the Governing Agreement, nor was LLIC shown the Governing Agreement prior to November 1997. (SJ Count 5, Def's 7.5 Stat. ¶ 15). According to Dube and LLIC, Dube was told that ERU had an agreement with ABLAC to be able to transfer the ABLAC

policies to LLIC, but was not given a copy of the Governing Agreement. (SJ Count 5, Def's 7.5 Stat. ¶ 16). It is undisputed that when LLIC asked to inspect the Governing Agreement sometime in 1999 or 2000, ERU initially refused to provide it, on grounds of confidentiality. (SJ Count 5, Def's 7.5 Stat. ¶ 17). LLIC contends that it was finally given a copy of the Governing Agreement in late 2000, but still never joined, signed, executed or ratified the Governing Agreement. (SJ Count 5, Def's 7.5 Stat. ¶ 17).

In 2000, ERU filed an arbitration claim against ABLAC, which raised a dispute over some of the ABLAC business involved in the Governing Agreement and alleged that ABLAC had breached that Agreement. (SJ Count 5, Def's 7.5 Stat. ¶ 21). In October 2000, ERU explicitly released ABLAC from the terms of the Governing Agreement in a formal Modification Agreement. (SJ Count 5, Def's Reply Exh. D).

### The ERU–LLIC Agreement

It is undisputed that ERU was authorized under the Governing Agreement to select the replacement insurer for the ABLAC block of business. ERU sought to transfer that business to LLIC. On November 13, 1997, LLIC entered into an agreement with ERU (the "ERU–LLIC Agreement"). The ERU–LLIC Agreement states: "ERU has been contractually authorized by American Bankers Life Assurance Company (ABLAC) to replace existing group policies as specified in the agreement between ABLAC, Swiss Re, and ERU with a new group insurance carrier." (SJ Count 5, Def's 7.5 Stat. ¶ 22). Under the ERU–LLIC Agreement, ERU was to act as the sole administrator for LLIC for certain blocks of business mutually agreed to by the parties. (SJ

Count 4, Plaintiff's 7.5 ¶ 1; SJ Counts 10/12, Def's 7.5 Stat. ¶ 12). LLIC agreed not to transfer the administration of that business to any other entity, including itself, during the terms of the agreement. (SJ Count 4, Def's 7.5 ¶ 1). The business that LLIC transferred to ERU for administration under this agreement included the business that ERU had previously administered for ABLAC, if ERU was able to get that business transferred to LLIC, as well as any new business brought to LLIC by ERU producers. (SJ Count 4, Def's 7.5 ¶ 2). The Agreement also provided that other business or products may be included by mutual consent. (SJ Count 4, Def's 7.5 ¶ 3).

### The Reinsurance Treaty Summary

Subsequent to the signing of the ERU–LLIC Agreement, LLIC entered into discussions with Swiss Re in order to develop and structure a reinsurance treaty with Swiss Re for the ABLAC block of business. (SJ Count 7, Plaintiff's 7.5 ¶ 4). After a fairly lengthy period of time, Swiss Re and LLIC had still not completed a final reinsurance treaty for the ABLAC block of business. Instead, the parties executed a Reinsurance Treaty Summary, outlining the basic points for inclusion in the reinsurance treaty they would eventually sign. (SJ Count 7, Plaintiff's 7.5 ¶ 5). The Reinsurance Treaty Summary was signed by Bob Dube of LLIC on November 16, 1997 and by David Nussbaum of Swiss Re on December 1, 1997. (Third Amnd. Cmpt., Exh. Q at 3). Both Mary Ellen Jankunis of Swiss Re and Bob Dube of ERU agree that the Reinsurance Treaty Summary is a binding agreement. (SJ Count 7, Plaintiff's 7.5 ¶¶ 8, 9).

The Treaty Summary is a series of bullet-pointed items. (Third Amnd. Cmpt., Exh. Q). The Treaty Summary states that

the "Business Reinsured" under the Treaty is "All Group Life, Group Accidental Death and Dismemberment and Short Term Disability Insurance underwritten and administered by Excess Risk Underwriters (ERU)." (Third Amnd. Cmpt., Exh. Q at 2). The Treaty Summary further states: "Administration: Monthly. To be administered by ERU." (Third Amnd. Cmpt., Exh. Q at 2).

ERU and LLIC dispute what business is covered by the Treaty Summary. ERU contends that the Treaty Summary applies to all inforce, or existing business, and all new business insured by LLIC and reinsured by Swiss Re. LLIC contends that the Treaty Summary applies only to the ABLAC renewal block policies and any new policies brought to LLIC by ERU producers, on a case-by-case basis. ERU's Complaint alleges that LLIC did not utilize ERU to administer business with Financial Designs, Inc. ("FDI"), a broker and third party administrator of insurance products and an alleged ERU producer. (SJ Count 7, Plaintiff's 7.5 ¶ 13). LLIC disputes whether FDI was an ERU producer when it caused its block of policies to be transferred to LLIC. (SJ Count 7, Def's 7.5 ¶ 18).

### The Confidentiality Agreement

On December 16, 1997, ERU and Lafayette entered into a "Confidentiality and Nondisclosure Agreement" (the "Confidentiality Agreement"). (SJ Counts 10/12, Def's 7.5 Stat. ¶ 1). It is undisputed that both parties signed this Agreement. (SJ Counts 10/12, Def's 7.5 Stat. ¶ 3).

### The Hospital Pool Treaty

In 1998, ERU, LLIC, and Munich American Reassurance Company ("Munich Re") formed a relationship in which group life insurance policies would be sold to hospitals, offering life insurance to the employees of the hospitals as a group (the "Hospital Pool"). (SJ Count Six, Plaintiff's 7.5 Stat. ¶ 1). LLIC and Munich Re entered into a formal reinsurance treaty for the Hospital Pool (the "Hospital Pool Treaty") in December 1998. The Hospital Pool Treaty refers to LLIC as "the Ceding Company" and to Munich Re as "MARC–Life." (Exh. D to Cmpt.). Article VII of the Hospital Pool Treaty states: "Excess Risk Underwriters, Inc., Coral Gables, Florida (hereinafter called ERU) shall act as sole administrator for this block of business, except as noted in Exhibit III under Expense Allowance. ERU will be responsible for certain marketing, underwriting, administrative and claim services as described in the Managing General Underwriter's Agreement between the Ceding company and ERU." (Exh. D to Third Amnd. Cmpt. at 6). The provision entitled "Expense Allowances" in Exhibit III of the Hospital Pool Treaty states that, "[s]elected cases sold by the Ceding Company's distribution system may be administered by the Ceding Company with prior written approval from MARC–Life Underwriting Department. Administration fee applies to either Ceding Company or ERU, not to both." (Exh. D to Third Amnd. Cmpt. at 19).

The deposition testimony of Joe Malone, Assistant Vice President of Group and Credit Reinsurance at Munich Re, reveals his understanding that ERU would administer much of the Hospital Pool business, except that LLIC could administer certain cases involving local customers of LLIC with prior written approval from Munich Re. (SJ Count Six, Plaintiff's 7.5 Stat. ¶ 5; SJ Count Six, Def's 7.5 Stat. ¶ 11).

It is undisputed that following the establishment of the Hospital Pool Treaty, some

Hospital Pool cases were still administered at LLIC. (SJ Count Six, Def's 7.5 Stat. ¶ 9). As of January 1999, LLIC kept six cases to administer. (SJ Count Six, Def's 7.5 Stat. ¶ 9). Dale Luper, Assistant Vice President of Group Operations at LLIC, testified at his deposition that he was given the sole and independent authority to decide when ERU would administer a Hospital Pool case and when it would stay with LLIC. (SJ Count Six, Plaintiff's 7.5 Stat. ¶ 7). Luper did not feel ERU had the knowledge to handle certain kinds of complex cases. (SJ Count Six, Def's 7.5 Stat. ¶ 18). LLIC does not dispute that Robert Dube never advised Luper of LLIC's contractual arrangement for ERU regarding administration of the Hospital Pool business. (SJ Count Six, Plaintiff's 7.5 Stat. ¶ 10). It is also undisputed that LLIC did not obtain prior written consent from Munich Re before deciding which cases to transfer for administration by ERU and which cases to keep for administration by LLIC. (SJ Count Six, Plaintiff's 7.5 Stat. ¶¶ 8, 9).

Eventually, in late 1999 and effective January 1, 2000, LLIC terminated its reinsurance treaty with Munich Re for the Hospital Pool and shifted all of the Hospital Pool cases to Swiss Re as the reinsurer. In doing so, LLIC entered into a second reinsurance treaty, which does not refer to ERU as the sole administrator of Hospital Pool cases. (SJ Count Six, Plaintiff's 7.5 Stat. ¶ 12).

*The Transfer Policies Agreement*

Sometime in March 1999, Robert Dube of LLIC discussed with Steve Cullen of ERU a proposal under which LLIC would transfer certain non-Hospital Pool cases ("transfer cases") to ERU; the two men agreed that a document outlining all the terms of this agreement and ERU's com-

pensation would be drafted later. (SJ Count 4, Def's 7.5 ¶ 5). LLIC alleges that the non-Hospital Pool business LLIC planned to transfer to ERU was limited to cases that exceeded LLIC's capacity to administer. (SJ Count 4, Def's 7.5 ¶ 6). ERU contends that LLIC agreed to send cases to ERU for administration according to approximately nine specified criteria indicated in a written memo prepared by Joe Drewry of LLIC on April 7, 1999 (the "Drewry memo"). (SJ Count 4, Plaintiff's 7.5 ¶ 2). Steve Cullen sent an email to Dube suggesting that the transfer of this new business represents approximately 62 cases per month. (SJ Count 4, Def's 7.5 ¶¶ 7, 8).

Both parties agree that on April 7, 1999, Joseph Drewry of LLIC sent the Drewry memo to the company's regional directors informing them that new cases falling within certain criteria would now be administered by ERU. (SJ Count 4, Def's 7.5 ¶ 9). Drewry drafted this memo after meeting with Dube and representatives of LLIC's underwriting and administrative staffs. (SJ Count 4, Def's 7.5 ¶ 9). However, ERU alleges that the Drewry memo is incorrect in its assertion that "we have made an agreement with Excess Risk Underwriters." (SJ Count 4, Def's 7.5 ¶ 10). Dube contends that the memorializing of the transfer process would be part of an agreement to be made at a later time. (SJ Count 4, Def's 7.5 ¶ 10). Dube did not know whether the Drewry memo was sent to Mrs. Monika Cullen, vice-president of ERU, before it was sent to LLIC's regional directors. (SJ Count 4, Def's 7.5 ¶ 12).

On December 22, 1999, Mr. Cullen sent a letter to Dube indicating his interest in "finalizing the MGU Agreement on a basis that will be mutually acceptable to both parties." (SJ Count 4, Def's 7.5 ¶ 14). He

stated, "Completion of this agreement is only formal documentation of what has been agreed to in principal [sic] by both ERU and LLIC over the past 24 months." (SJ Count 4, Def's 7.5 ¶ 14). He further stated, "[a] new issue that must be incorporated in the MGU Agreement is quantifying the amount of new business administration that LLIC will be assigning to ERU each year." (SJ Count 4, Def's 7.5 ¶ 14). The December 22, 1999 letter does not reference the Drewry memo. (SJ Count 4, Def's 7.5 ¶ 14).

On December 29, 1999, Dube replied to Mr. Cullen's letter in a letter of his own, stating that "[w]e are willing to commit to a level of cases, based either on premium or some other mutually agreeable basis, which will be assigned to ERU to administer as long as the MGU agreement remains in effect and as long as we believe you are providing an appropriate level of quality administration." (SJ Count 4, Def's 7.5 ¶ 15).

It is undisputed that the MGU agreement, which both Dube and Mr. Cullen expected to be the instrument within which the terms of any Transfer Policy Agreement would be stated, has never been finalized. (SJ Count 4, Def's 7.5 ¶ 16). Since early 1999, ERU has been given administration of 142 additional policies. (SJ Count 4, Plaintiff's 7.5 ¶ 5). ERU alleges that 906 cases should have been transferred. (SJ Count 4, Plaintiff's 7.5 ¶ 7).

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure authorizes summary judgment when the pleadings and supporting materials show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court's focus in reviewing a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). The moving party has the burden to establish the absence of a genuine issue as to any material fact. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Tyson Foods, Inc.*, 121 F.3d at 646.

Once the moving party has established the absence of a genuine issue of material fact, to which the nonmoving party bears the burden at trial, it is up to the nonmoving party to go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Celotex v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). A factual dispute is genuine only if the evidence is such that a reasonable fact finder could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–51, 106 S.Ct. at 2510–11; *Denney v. City of Albany*, 247 F.3d 1172, 1181 (11th Cir.2001).

If the non-moving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof, the court must enter summary judgment for the moving party. *Id.* (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552). Moreover, when the non-moving party bears the burden of proof on an issue, the moving party need not support its motion with affidavits or other similar material negating the opponent's claim. *Id.* (citing *Celotex*, 477 U.S. at 323,

106 S.Ct at 2553). Instead, the moving party simply may show that there is an absence of evidence to support the non-moving party's case. *Id.* (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2554).

In assessing whether the movant has met its burden, the court should view the evidence in the light most favorable to the party opposing the motion and should resolve all reasonable doubts about the facts in favor of the non-movant. *Id.* (citation omitted). Nevertheless, in determining whether to grant summary judgment, the court must remember that, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.,* 477 U.S. at 255, 106 S.Ct. at 2513.

■ In rendering a decision based upon the substantive law of Florida, a federal court must "decide the case the way it appears the state's highest court would." *Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F.3d 1285, 1290 (11th Cir. 2001) (citing *Royal Ins. Co. of Am. v. Whitaker Contracting Corp.,* 242 F.3d 1035, 1040 (11th Cir.2001)). Where the state's highest court has not spoken to an issue, a federal court "must adhere to the decisions of the state's intermediate appellate courts absent some persuasive indication that the state's highest court would decide the issue otherwise." *Id.* (citing *Ins. Co. of N. Am. v. Lexow,* 937 F.2d 569, 571 (11th Cir.1991)).

## ANALYSIS

*Count Five: Breach of the Governing Agreement*

LLIC seeks summary judgment on Count Five of the Third Amended Complaint and those portions of Count One that duplicate the allegations in Count Five. Count Five alleges that LLIC was substituted for ABLAC as the replacement issuing insurer of the ABLAC policies and is a party to the Governing Agreement by a novation; ERU alleges that LLIC breached the Governing Agreement by failing to honor the provision of the Governing Agreement requiring ERU to act as the sole administrator and by failing to expand and develop the ABLAC business.

LLIC seeks summary judgment, arguing that there was no novation substituting LLIC for ABLAC as a party to the Governing Agreement, thus LLIC is not a party to that Agreement and cannot be sued for its breach. ERU argues in response that a genuine issue of material fact exists as to whether LLIC knowingly became the "replacement issuing Insurer" under the terms of the Governing Agreement and thereby became bound by its terms.

■ At oral argument, Plaintiff was able to state exactly what is at issue with respect to Count Four. Plaintiff clarified the difference between ABLAC's obligations under the Governing Agreement and LLIC's obligations under the ERU–LLIC Agreement of November 1997 and the Reinsurance Treaty Summary. ERU has alleged in Count One of the Complaint that LLIC breached its duty to use ERU as the sole and exclusive administrator of the ABLAC Block of business. Count Five alleges that LLIC breached the same duty, except that the duty derives from the Governing Agreement. Furthermore, ERU alleges in Count Seven that it was an intended third-party beneficiary of the Reinsurance Treaty Summary between Swiss Re and LLIC and that LLIC breached that Summary by not transferring admin-

istration of the ABLAC block to ERU. This begs the question: if LLIC was obligated under the ERU–LLIC Agreement and Reinsurance Treaty Summary to transfer administration of the ABLAC block of business to ERU, what *additional* duties would LLIC have as a result of a novation rendering LLIC liable under the Governing Agreement?

The ERU–LLIC Agreement of November 1997 states that the administration services "rendered by ERU to Lafayette Life pertain solely to Group Life, AD & D, STD, LTD, and Voluntary Life and AD & D coverage on ABLAC's renewal block as well as new business brought to Lafayette Life by ERU producers." (Third Amnd. Cmpt., Exh. B). The Reinsurance Treaty Summary states that the business reinsured under the agreement between LLIC and Swiss Re is "All Group Life, Group Accidental Death and Dismemberment and Short Term Disability Insurance underwritten and administered by Excess Risk Underwriters (ERU)." (Third Amnd. Cmpt., Exh. Q). The scope of these two agreements is therefore arguably limited to the ABLAC renewal block of business and any new business brought to LLIC by ERU producers.[2] In contrast, the Governing Agreement states, "Swiss Re further agrees that ERU shall be the administrator of formerly ABLAC business and also for new business written by the replacement Issuing Insurer." (Third Amnd. Cmpt., Exh. A at § 6). Under the Governing Agreement, the replacement issuing insurer is arguably bound to send *all* its new business to ERU for administration.[3] There is no clause limiting that obligation to business which ERU chooses to bring to LLIC. ERU thus seeks to bind LLIC to the Governing Agreement because it seeks to enforce an obligation by LLIC to utilize ERU as sole administrator for all of LLIC's new business—an obligation not placed on LLIC by the ERU–LLIC Agreement nor the Reinsurance Treaty Summary.

■ In its Complaint, ERU seeks to bind LLIC to the Governing Agreement by means of a novation. Under Florida law, the four elements necessary to demonstrate a novation are: (1) the existence of a previously valid contract; (2) the agreement to make a new contract; (3) the intent to extinguish the original contractual obligation; and (4) the validity of the new contract. *Sink v. Abitibi–Price Sales Corp.*, 602 So.2d 1313 (Fla. 4th DCA 1992) (citing *Sans Souci v. Division of Florida Land Sales & Condominiums*, 421 So.2d 623, 630 (Fla. 1st DCA 1982), rev'd on other grounds, 448 So.2d 1116 (Fla. 1st DCA 1984); 11 Fla.Jur.2d Contracts § 183).

Applying the criteria for a novation, the parties agree as to three of the four elements. They agree: (1) that the Governing Agreement was a valid contract, (2) that there existed an agreement to make a new contract, which takes the form of the ERU–LLIC Agreement, and (3) that the ERU–LLIC Agreement is a valid contract. The parties dispute whether in making the ERU–LLIC Agreement they intended to

---

**2.** The scope of these agreements are contested and shall be discussed in greater detail in the sections of this Order analyzing Counts Seven, Ten, and Twelve.

**3.** However, the relevant provision—Section Six of the Governing Agreement—refers only to what Swiss Re agrees and it is not clear whether that provision would bind ABLAC or any other party. In other words, it is possible that Section Six may only be utilized to enforce Swiss Re's promise and not to enforce an obligation on any other party.

extinguish the original contractual obligation of ABLAC under the Governing Agreement.

■■■ The party asserting a novation carries the burden of proving the parties' intent to engage in the original transaction and to release the original contractual obligation in exchange for a contract. *Estate of Johnston v. TPE Hotels, Inc.*, 719 So.2d 22, 25 (Fla. 5th DCA 1998); *Travis v. Central Sur. & Ins. Corp.*, 117 F.2d 595, 596 (5th Cir.1941). In this case, ERU, as the party asserting a novation, carries the burden of proving the parties' intent to create a novation. *Id.* This burden requires ERU to demonstrate the parties' intention to extinguish the original obligation of the party to the original contract for whom substitution is sought, in this case ABLAC. *See, e.g., Taines v. Capital City First Nat'l Bank*, 344 So.2d 273, 277 (Fla. 1st DCA 1977) (finding no novation where no evidence demonstrated intent to extinguish original obligation). Under Florida law, "a clear agreement or manifestation of intention of both parties to that effect is essential." *U.S. v. Nill*, 518 F.2d 793 (5th Cir.1975) (citing *Murphy v. Green*, 102 Fla. 102, 135 So. 531, 534 (1931)). The Fifth Circuit, interpreting Florida law, stated that "[i]n the absence of a clear agreement ... there must be a clear manifestation of an intention that such was the agreement." *Id.* "Novation cannot be presumed; it must be shown to have been intended by a clear preponderance of the evidence, and upon the party urging it is cast the burden of making the required proof." *Travis v. Central Sur. & Ins. Corp.*, 117 F.2d 595, 596 (5th Cir.1941) (affirming summary judgment where party asserting novation demonstrated insufficient evidence of intent). Nevertheless, as the party moving for summary judgment,

LLIC bears the burden of demonstrating that there exists no genuine issue of material fact. If a genuine issue of material fact exists, summary judgment is inappropriate. *See Wolowitz v. Thoroughbred Motors, Inc.*, 765 So.2d 920, 923–24 (Fla. 2d DCA 2000) (reversing summary judgment order because fact questions existed concerning the parties' intent to create a novation); *Pinnacle Holding, Inc. v. Biologics, Inc.*, 643 So.2d 642 (Fla. 2d DCA 1994) (same). Whether the parties intended to create a novation is ordinarily a question of fact. *Young v. Morris Realty Co.*, 569 So.2d 813, 814 (Fla. 1st DCA 1990).

LLIC argues there is no question regarding the intent of the parties based upon their objective actions and the lack of a legally sufficient incorporation of the Governing Agreement into the ERU–LLIC Agreement. Specifically, LLIC argues that: (1) the ERU–LLIC Agreement does not explicitly provide for a novation, and (2) ERU's actions demonstrate that ERU lacked intention to release ABLAC from its obligations under the Governing Agreement.

■ The ERU–LLIC Agreement states: "ERU has been contractually authorized by American Bankers Life Assurance Company (ABLAC) to replace existing Group policies as specified in the agreement between ABLAC, Swiss Re, and ERU with a new group insurance carrier." The parties disagree about the meaning of this sentence. ERU contends that this sentence incorporates the Governing Agreement into the ERU–LLIC Agreement. *See, e.g., OBS Co., Inc. v. Pace Constr. Corp.*, 558 So.2d 404, 406 (Fla.1990) ("[W]here a writing expressly refers to and sufficiently describes another document, that other document, or so

much of it as is referred to, is to be interpreted as part of the writing."). ERU argues that incorporation is further evidenced by the fact that the sequence of dates and deadlines in the ERU–LLIC Agreement mirrors the sequence in the Administrative Services Addendum of the Governing Agreement.

LLIC argues that the mere reference to an agreement between ABLAC, Swiss Re, and ERU is insufficient to incorporate the terms of that agreement. LLIC is correct. Florida law requires that there must be "some expression in the incorporating document . . . of an intention to be bound by the collateral document . . . . A mere reference to another document is not sufficient to incorporate that other document into a contract, particularly where the incorporating document makes no specific reference that it is 'subject to' the collateral document." *Temple Emanu-El of Greater Ft. Lauderdale v. Tremarco Indus., Inc.*, 705 So.2d 983, 984 (Fla. 4th DCA 1998) (citing *Kantner v. Boutin*, 624 So.2d 779, 781 (Fla. 4th DCA 1993)); *see also Sharpe v. Lytal & Reiter, Clark, Sharpe, Roca, Fountain, Williams*, 702 So.2d 622 (Fla. 4th DCA 1997); *Management Computer Controls, Inc. v. Charles Perry Const., Inc.*, 743 So.2d 627, 631 (Fla. 1st DCA 1999) (stating that a document may be incorporated by reference in a contract only if the contract specifically describes the document and expresses the parties' intent to be bound by its terms). Florida courts require explicit language stating that the parties intend to be bound by the terms of a collateral document in order for the parties to be bound by that document. *Temple Emanu-El*, 705 So.2d at 984 (refusing to enforce arbitration clause in a warranty where contract mentioned warranty but did not explicitly subject parties to its terms). A contract must contain "words . . . indicating an intention that [the parties] between themselves, [agree] to be bound by the [collateral document]." *Id.* The statement in the ERU–LLIC Agreement that ERU has selected LLIC as the replacement carrier "as specified" in the Governing Agreement references ERU's authority to select the replacement carrier; it does not state that LLIC has been selected subject to ABLAC's obligations in the Governing Agreement. That sort of incorporation by reference requires something far more explicit than what is contained in the ERU–LLIC Agreement.

Intention to establish a novation is supposed to be determined by fair construction of the terms of the contract itself and by the subject matter to which it has reference. *Don L. Tullis and Assocs., Inc. v. Benge*, 473 So.2d 1384, 1386 (Fla. 1st DCA 1985) (citing *Local No. 234 v. Henley & Beckwith, Inc.*, 66 So.2d 818 (Fla.1953)). However, where a contract is silent as to the effect of new arrangements upon the original parties' obligations, novation must be determined by ascertaining the intent of the parties from the evidence in the case. *Travis v. Central Sur. & Ins. Corp.*, 117 F.2d 595, 596 (5th Cir.1941) (determining intent to create a novation at summary judgment stage by examining the pleadings, exhibits, and stipulation of facts).

Because the contract itself does not state whether or not a novation was to occur, I must analyze the parties' arguments concerning their intent. LLIC contends that there exists no material question of fact regarding the parties' intent. LLIC points to provisions in the Governing Agreement which suggest that ERU did not intend for the ERU–LLIC Agreement to release ABLAC from its

obligations. For instance, the terms of the Governing Agreement contemplate the signing of a separate contract between ERU and the replacement carrier regarding new business which would have to be bargained for by mutual consent. (Exh. A to Cmpt. at 17). The paragraph entitled "Selection of Insurance Carriers to Write New Business After September 30, 1997," states that "ERU as the sole administrator of Swiss Re is authorized to contract with one or more life insurance carrier(s) in order for ERU to continue to write new business for new and existing groups after September 30, 1997, subject to the approval of Swiss Re which approval shall not be unreasonably withheld." From this provision, it is evident that ERU was authorized to enter into a *separate* and *additional* contract with an insurance carrier regarding new business; this suggests that the intent of the parties was not for the new business of the replacement insurer to be subject to the terms of the original Governing Agreement.[4]

LLIC presents additional evidence that the parties did not intend to release AB-LAC from its obligations under the Governing Agreement—something that would be required in order to effect a novation.

*Moring v. Miller*, 330 So.2d 93, 95 (Fla. 1st DCA 1976). ("[M]ere acceptance of the obligation of the assignee without any intention to relieve the original debtor is not, in and of itself, sufficient to constitute a novation."). It is undisputed that in 2000, after the alleged novation in 1997, ERU explicitly released ABLAC from the terms of the Governing Agreement in a formal Modification Agreement. This formal release demonstrates that ABLAC had not yet been relieved of its obligations at the time of the alleged novation. LLIC contends that ERU has misconstrued the Modification Agreement as concerning all cases within the ABLAC block when in fact the Modification Agreement concerned only those cases which had not been rolled over for LLIC to assume the risk. However, LLIC's argument merely proves that there could not have been a novation since an incremental practice of rolling policies over from ABLAC to LLIC conflicts with the basic premise of a novation—that one party is dropped into the place of another, assuming all its obligations at that time. Accordingly, the Modification Agreement is evidence that there is no material question of fact regarding the parties' intent to release ABLAC from its obligations under

---

4. LLIC also points to a provision in the Governing Agreement prohibiting successors, assignees, and assignment without the prior written consent of all the parties to the Governing Agreement. Paragraph K in Section 14 of the Governing Agreement states: "This Agreement shall be binding upon the parties hereto and their respective successors and assigns: however, this Agreement and the authorities, duties and responsibilities hereunder shall not be assigned without the prior written consent of the other parties, except as specifically addressed in this Agreement." (Exh. A to Cmpt. at 13). LLIC argues that this prohibition on assignment without prior written consent suggests that LLIC cannot have been assigned the duties and authorities of ABLAC since ERU has not introduced prior written consent in evidence. I do not find

this argument persuasive based on binding Florida law. The Florida Supreme Court has explicitly held that "the assignability or non-assignability of a contract really has no application in determining whether a novation occurred." *Orlando Orange Groves Co. v. Hale*, 119 Fla. 159, 175–76, 161 So. 284 (1935). The Court explained: "A nonassignable contract may be novated as easily as an assignable one, because, in a novation, the primary element is the consent of the parties. Where all the parties involved in a particular contract consent to the novation, the novation is, by that consent, accomplished." *Id.* at 176, 161 So. 284. Accordingly, I do not consider the non-assignment clause persuasive evidence that no novation took place.

the Governing Agreement at the time LLIC entered into its agreement with ERU in November 1997.

▮▮▮ ERU contends that there exists record evidence to create a material question of fact about the parties' intent to establish a novation. ERU's contention derives primarily from the declaration of Martin Cullen, which states that Cullen personally reviewed the Governing Agreement with Robert Dube of LLIC, provided Dube with a copy of the Governing Agreement, and specifically agreed to incorporate the Governing Agreement in the subsequent ERU–LLIC Agreement. (Cullen Decl. at ¶¶ 6, 12). ERU also bases its argument upon deposition testimony from Swiss Re employees indicating that Swiss Re informed LLIC that the Governing Agreement existed, and upon the Reinsurance Treaty Summary that LLIC negotiated with Swiss Re (to which ERU is not a party, but is alleged to be an intended third-party beneficiary). In large part, the relevance of the Reinsurance Treaty Summary is based upon a single sentence that states, "[i]nforce business shall follow the provisions of the American Bankers reinsurance agreement." Ultimately, I conclude that none of this evidence demonstrates the parties' intention to extinguish the original obligation of ABLAC and to have LLIC reinsure under the terms of the Governing Agreement.[5]

The deposition testimony and Cullen declaration demonstrate, at best, that LLIC was aware of the existence of the Governing Agreement (something that LLIC disputes). While there is an issue of fact as to whether LLIC was aware of the Governing Agreement, this dispute does not concern a material fact. LLIC's knowledge that the Governing Agreement existed does not translate into its intention to enter into the ERU–LLIC Agreement subject to the Governing Agreement's terms. The sentence in the Reinsurance Treaty Summary between LLIC and Swiss Re does not contain the kind of clear language required—in particular, because the "American Bankers reinsurance agreement" it references is not the Governing Agreement, but rather a separate reinsurance agreement with ABLAC to which ERU was not a party—something conceded by LLIC in its Local Rule 7.5 Statement. Furthermore, I conclude that the provision referencing the American Bankers reinsurance agreement only references that agreement with respect to its cancellation term. It is clear from the fact of the Reinsurance Treaty Summary that this clause only applies to the subsection entitled "Cancellations." Accordingly, it is not persuasive evidence that the parties intended to effect a novation subjecting LLIC to all of ABLAC's obligations under the Governing Agreement.

At oral argument, ERU conceded that it really had no viable legal argument that a novation occurred rendering LLIC liable under all the terms of the Governing Agreement. For example, a novation would bind LLIC to all the terms of the Governing Agreement, including the mandatory arbitration clause in Section Fourteen, Paragraph J of that Agreement. ERU does not argue that its claims are subject to the mandatory arbitration

---

5. ERU also contends that a provision in the Governing Agreement stating that "replacement of risks identified herein shall be contingent upon and subject to the provisions of this Agreement" subjects LLIC, as the replacement insurer, to the terms of the Governing Agreement. This argument merely begs the question, however, since LLIC was not a signatory to the Governing Agreement.

clause, and seemed to refute that notion at oral argument. ERU fell back upon the argument that the parties' actions demonstrated an intent for LLIC to obtain the benefits of the Governing Agreement by collecting fees on the ABLAC block, but LLIC failed to fulfill its subsequent obligations. After reviewing all of the parties' written agreements and the rest of the record evidence, I conclude that the ERU–LLIC Agreement contains the most specific language about the obligations of ERU and LLIC and the scope of the business which they contracted to transfer. ERU could have but did not negotiate with LLIC to include the broader language of the Governing Agreement in the ERU–LLIC Agreement. LLIC has met its burden to show that there exists no material question of fact whether the parties intended to effect a novation binding LLIC to the terms of the Governing Agreement, and ERU has failed to submit any persuasive evidence to the contrary. LLIC's motion for summary judgment as to Count Five is therefore GRANTED.

*Count Four: Breach of the Transfer Policies Agreement*

 ERU seeks summary judgment as to liability for Count Four of the Third Amended Complaint, which alleges breach of the Transfer Policies Agreement whereby LLIC would transfer non-Hospital Pool cases for administration to ERU. Specifically, ERU asserts that no genuine issue of material fact remains "as to LLIC's breach in failing to supply ERU all of the transfer policies it should have for administration, according to the agreement of the parties and their accepted criteria." The "accepted criteria," according to ERU, are outlined in the Drewry memo which was distributed internally at LLIC.

LLIC argues that summary judgment is not appropriate because a genuine dispute of fact exists as to whether the parties agreed that LLIC would send cases to ERU under the criteria in the Drewry memo. LLIC argues that Dube never approved the criteria in the Drewry memo and that both Mr. Cullen and Mr. Dube admitted at times after the circulation of the Drewry memo that a transfer agreement had not yet been finalized.

Certainly, an issue of fact exists as to whether there was a meeting of the minds regarding the criteria to be used in determining what cases would be transferred. *See, e.g., Zell v. Cobb,* 566 So.2d 806, 808–09 (Fla. 3d DCA 1990) (finding no meeting of the minds due to parties' divergent views as to price, quantity, and other key terms); *compare Tipton v. Woodbury,* 616 F.2d 170, 177 (5th Cir.1980) (holding valid a contract for purchase of securities where price, quantity, and sufficient description of stock were given but term regarding time and place of payment was missing). In this case, the parties dispute the criteria to be used in determining which policies were to be transferred for administration from LLIC to ERU. They dispute whether the Drewry memo represented the memorialized intent of the parties. LLIC has introduced sufficient evidence into the record to refute ERU's contention that no genuine issue of fact exists as to liability. For example, the Court finds persuasive the correspondence between Mr. Dube and Mr. Cullen in December 1999 where the parties indicate disagreement about the terms of the transfer of cases. While ERU contends that the Transfer Policies Agreement was created in early 1999, the parties' subsequent actions belie that contention. *See Lalow v. Codomo,* 101 So.2d 390, 393 (Fla.1958) (holding that actions of parties subsequent to entering agreement may be considered to determine their intentions).

At oral argument, ERU requested that I consider granting partial summary judgment only as to the existence of an agreement between ERU and LLIC that LLIC would transfer administration of non-hospital pool cases to ERU. In other words, ERU argued that I could render summary judgment regarding the existence of an agreement despite the material dispute concerning the terms of that agreement. I conclude based upon Florida law that there remains a question of material fact as to the existence of an agreement minus such crucial terms as quantity and the criteria to determine quantity. A jury may find that an agreement exists, but I cannot do so at this stage. *Cf. Martin v. Jack Yanks Const. Co.*, 650 So.2d 120, 121 (Fla. 3d DCA 1995) (reversing final judgment for lack of a binding agreement where parties disputed the price term and disputed the means of determining a price), rev. denied, 659 So.2d 1087 (Fla. 1995); *Zell*, 566 So.2d at 808–809 (affirming summary judgment for defendant because lack of agreement as to key terms conclusively disproved existence of a binding agreement).

This is not to suggest that ERU may not succeed at trial; a jury may very well find that the Drewry memo constituted the final, memorialized agreement of the parties to transfer non-hospital pool cases to ERU for administration according to set criteria. However, at this stage, I must limit my analysis to whether a genuine dispute of material fact exists. I conclude that a dispute exists and thus summary judgment is in appropriate. Accordingly, ERU's motion for partial summary judgment as to Count Four of the Third Amended Complaint is DENIED.

*Count Six: Breach of the Hospital Pool Treaty*

 ERU seeks partial summary judgment on Count Six of the Third Amended Complaint, which alleges that ERU is an intended third-party beneficiary of the Hospital Pool Treaty between LLIC and the reinsurer, Munich Re. Count Six alleges that LLIC breached the Hospital Pool Treaty by not allowing ERU to function as the sole and exclusive administrator of all Hospital Pool policies and by keeping a number of those policies for LLIC to act as administrator. ERU seeks partial summary judgment as to LLIC's liability to ERU as an intended third-party beneficiary and as to LLIC's breach of the Hospital Pool Treaty, but does not seek summary judgment as to the amount of damages.

ERU argues that there is no genuine dispute of material fact concerning LLIC's obligations to ERU and LLIC's breach of those obligations. The Hospital Pool Treaty states that ERU shall act as "sole administrator" for the Hospital Pool business except that "[s]elected cases sold by [LLIC's] distribution may be administered by [LLIC] with prior written approval from [Munich Re]." (Exh. D to Third Amnd. Cmpt. at 6, 19). LLIC argues that this clause was not binding because LLIC alleges: (1) the agreement was modified by a contemporaneous oral agreement that LLIC would have sole discretion as to what cases would be retained for administration; and (2) the agreement was modified by the subsequent conduct of the parties. Accordingly, I must determine if this clause is binding or if there is exists a material dispute of fact as to its subsequent modification. If I determine that the clause is binding, ERU is entitled to summary judgment because there no material dispute about the fact that LLIC did not obtain prior written approval from Munich Re before keeping six cases to admin-

ister. (SJ Count Six, Def's 7.5 Stat. ¶ 13).[6]

■ ERU argues that it is entitled to summary judgment as to LLIC's breach of the Hospital Pool Treaty. Under Florida law regarding insurance contracts, a court must first examine the natural and plain meaning of an insurance contract's language. *Key v. Allstate Ins. Co.,* 90 F.3d 1546, 1548–49 (11th Cir.1996) (citing *Dahl–Eimers v. Mutual of Omaha Life Ins. Co.,* 986 F.2d 1379, 1382 (11th Cir.1993)). If the terms of an insurance contract are "clear and unambiguous," Florida law requires a court to "interpret the contract in accordance with its plain meaning, and, unless an ambiguity exists, a court should not resort to outside evidence or the complex rules of construction to construe the contract." *Id.* (citing *Rigel v. National Casualty Co.,* 76 So.2d 285, 286 (Fla.1954)); *see also Ernie Haire Ford, Inc. v. Ford Motor Co.,* 260 F.3d 1285, 1290–91 (11th Cir.2001) ("[W]hen the terms of a voluntary contract are clear and unambiguous, the contracting parties are bound by those terms, and a court is powerless to rewrite the contract to make it more reasonable or advantageous for one of the contracting parties.") (quoting *Emergency Assocs. of Tampa, P.A. v. Sassano,* 664 So.2d 1000, 1003 (Fla. 2d DCA 1995)).

LLIC urges me to consider evidence of a contemporaneous oral agreement between Munich Re and LLIC that LLIC would have sole discretion to determine which cases it was authorized to administer and which cases it would send to ERU for administration. According to LLIC, at the time Munich Re and LLIC signed the Hospital Pool Treaty, LLIC's representative, Bob Parker, discussed with Munich

Re's representative, Joe Malone, that LLIC would have sole discretion to decide which cases it would retain for administration. LLIC suggests that this discussion at the time the parties signed the agreement constitutes a contemporaneous oral agreement that I should consider as part of the contract or as a modification of the contract.

■ Under Florida law, "evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract." *Johnson Enters. of Jacksonville v. FPL Group,* 162 F.3d 1290, 1309 (11th Cir.1998). "This rule applies when the parties intend that a written contract incorporate their final and complete agreement." *Id.* The parol evidence rule is substantive law, so it is applied by federal courts sitting in diversity. *Id.* at 1309 n. 47.

■ There exists an exception to the parol evidence rule—parol evidence is admissible to establish a contemporaneous oral agreement which induced the execution of a written contract, though it may vary, change, or reform the instrument. *See, e.g., Mallard v. Ewing,* 121 Fla. 654, 664, 164 So. 674 (1935). Under this "inducement" exception to the parol evidence rule, the party submitting parol evidence carries a heavy burden of proof. "The inducement exception requires the oral agreement to be shown by evidence that is clear, precise, and indubitable; that it shall be found that the witnesses are credible, that they distinctly remember the facts to which they testify, and that they narrate the details exactly and that their statements are true." *Ungerleider v. Gordon,*

---

**6.** LLIC does not dispute that ERU was an intended third-party beneficiary of the Hospital Pool Treaty. *See, e.g.,* Opposition to SJ Count Six at 14.

214 F.3d 1279, 1282 (11th Cir.2000) (quotations omitted). "Under Florida law, the inducement exception does not apply where the alleged oral agreement relates to the identical subject matter embodied in the written agreement and directly contradicts an express provision of the written agreement." *Id.* (quotations omitted); *see also Bond v. Hewitt,* 111 Fla. 180, 185, 149 So. 606, 608 (Fla.1933) (stating that parol evidence is admissible "when consistent with, and not contrary to, such written instrument"). In other words, "the inducement exception permits parol evidence of a contemporaneous oral agreement to 'vary, change, or reform' a written instrument, but not to directly contradict it." *Ungerleider,* 214 F.3d at 1284 (citations omitted).

LLIC's argument that an oral modification occurred contemporaneously is deficient in several ways. First, LLIC has introduced evidence that its representative expressed concerns about the provision requiring written consent from Munich Re before retaining a case for administration, but LLIC has not introduced anything conclusive enough to qualify as evidence of an agreement. Viewing the record in the light most favorable to LLIC, the non-moving party, I conclude that the deposition testimony of Dube and the Declaration of Robert Parker reveal only that Dube protested about the written consent requirement, but signed the contract with that provision intact. This evidence is not "clear, precise, and indubitable" proof of a contemporaneous oral agreement, nor does it raise any genuine dispute of material fact as to the existence of such an agreement. In addition, the alleged oral modification directly contradicts the written contract and does not merely vary or add to the Hospital Pool Treaty. The Treaty clearly states that written consent of Mu-

nich Re is required, and the alleged oral modification would directly contradict that requirement. Accordingly, I conclude that the written contract is binding despite oral protests made by LLIC prior to signing the agreement.

 LLIC argues that even if no contemporaneous agreement took place, the Hospital Pool Treaty was modified by the subsequent course of dealing and performance of the parties. If the contract was indeed modified to eliminate the requirement of written consent and to provide LLIC with sole discretion as to which cases it would retain for administration, ERU would not be entitled to summary judgment. Under Florida law, the third party beneficiary's right of action on the promise cannot rise higher than the rights of the contracting party through whom he claims. *Seward v. South Florida Sec.,* 96 F.2d 964 (5th Cir.1938) (citing *Fidelity & Casualty Co. v. Plumbing Department Store,* 117 Fla. 119, 157 So. 506 (1934)). The nominal parties to a contract may even rescind the contract without consulting the third-part beneficiary, if the beneficiary has not accepted it or acted on it to his detriment. *Id.* (citation omitted). ERU responds to LLIC's contention that the agreement was modified by subsequent performance by arguing that LLIC confuses breach of the contract with modification; essentially, ERU claims that the agreement was not mutually modified, but simply breached by LLIC.

ERU argues that the Hospital Pool Treaty contains an integration clause providing that the Agreement is the "entire agreement between [Munich Re] and [LLIC] concerning the business reinsured hereunder," and that there were "no understandings between [the parties] other than as expressed [in the agreement]."

(Third Amnd. Cmpt., Exh. Q at 11). The Treaty also states that any modification would be null and void "unless made by an amendment to the agreement and signed by both [Munich Re] and [LLIC]." (Third Amnd. Cmpt., Exh. Q at 11).

▌ LLIC cites *Allapattah Services, Inc. v. Exxon Corp.*, 61 F.Supp.2d 1308 (S.D.Fla.1999), for the proposition that a written contract may be modified by a subsequent oral agreement or subsequent conduct of the parties despite a written prohibition on such agreements.[7] *Id.* at 1314. It is true that Florida law "has clearly been established that a written contract may be modified by a subsequent oral agreement or subsequent conduct of the parties, even though the written contract purports to prohibit such modification." *Beach Higher Power Corp. v. Granados*, 717 So.2d 563, 565 (Fla. 3d DCA 1998) (citations omitted). In *Beach Higher Power*, the court reversed the trial court's grant of summary judgment on the basis that the non-moving party had presented sufficient evidence of a subsequent oral modification to create a question of fact. *Id.; see also Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092, 1096 (Fla. 1st DCA 1999) ("Under certain circumstances, written contracts may be modified by a course of dealings, or by the parties' subsequent oral agreement.") (citing *Linear Corp. v. Standard Hardware Co.*, 423 So.2d 966, 968 (Fla. 1st DCA 1982)).

▌ While a course of dealing may modify a written agreement, when a

course of dealing and the terms of the contract appear to conflict, the parties' practice and the written agreement must be construed as consistent with each other if it is reasonable to do so. *Id.* If no reasonable consistent construction can be drawn, however, the express terms of the agreement must control. *Id.* (citing *Indian Harbor Citrus, Inc. v. Poppell*, 658 So.2d 605, 606 (Fla. 4th DCA 1995), rev. denied, 666 So.2d 144 (Fla.1995)). For example, in *Cox*, the operative written contracts expressly disclaimed any obligation on the part of the appellee to provide any specific quantity of freight or number of loads to the appellant. The contracts granted the appellee discretion to designate and dispatch commodity loads to particular drivers. The appellant argued that the contracts were silent as to how loads were to be dispatched and argued that the facts showed that the appellee had adopted an unwritten, "first-come, first-serve" policy to assign loads to drivers which had modified the written contract by the parties' course of dealings. It was the appellee's breach of this first-come, first-serve policy which the appellants contended was a breach of the parties' contracts. The court held that the policy established by the course of dealings could not be construed in a consistent manner with the express provisions of the contracts; as a result, the express provisions were held to control. *Id.* The appellate court affirmed the trial court's ruling that, as a matter of law, the express terms of the contracts precluded a modification of the contracts by the course of the dealings of the parties. *Id.*

---

7. *Allapattah* is distinguishable from the instant case since *Allapattah* was a contractual dispute governed by the Uniform Commercial Code. *Allapattah*, 61 F.Supp.2d at 1314 n. 7; *see also Tipton v. Woodbury*, 616 F.2d 170 (5th Cir.1980) (describing some of the differences between contract law under Florida common law and the UCC). This dispute is governed by common law, as it does not involve a contract for the sale of goods. *See* Fla. Stat. § 672.102 (2004) (stating that the UCC's Article 2 only applies to "transactions in goods").

In this case, LLIC proposes that the parties engaged in a subsequent modification of the Hospital Pool Treaty whereby LLIC would have sole discretion to decide which cases were to be administered by LLIC and which were to be administered by ERU. LLIC suggests that the parties simply waived the written approval requirement. I conclude that a subsequent modification waiving the written approval requirement is precluded as a matter of law since such a waiver cannot co-exist with the clear express provisions of the contract. Although I found no Florida Supreme Court case on this point, the decision of the First District Court of Appeals in Florida in *Cox v. CSX Intermodal, Inc.*, 732 So.2d 1092 (Fla. 1st DCA 1999) is binding absent some persuasive indication that the state's highest court would decide the issue otherwise. *See Ins. Co. of N. Am. v. Lexow*, 937 F.2d 569, 571 (11th Cir.1991) (stating that federal courts sitting in diversity should look to state intermediate appellate courts when no state Supreme Court case speaks to issue).

 Even if the written contract could reasonably coexist with a written modification abdicating the written consent requirement, LLIC may present a material question of fact only if it can point to sufficient record evidence that the parties indeed orally modified the contract. *See Bella Vista, Inc. v. Interior & Exterior Specialties Co., Inc.*, 436 So.2d 1107, 1108 (Fla. 4th DCA 1983) (party alleging subsequent modification to written agreement "has the burden to prove it"); *Newkirk Construction Corp. v. Gulf County*, 366 So.2d 813, 815 (Fla. 1st DCA 1979) (same). In order to prove a modification, LLIC must provide evidence of new consideration as well as the consent of both parties. *See Construction Corp. v. Gulf County*, 366 So.2d 813, 815 (Fla. 1st DCA 1979); *Wilson v. Odom*, 215 So.2d 37, 39 (Fla. 1st DCA 1968). I conclude that LLIC has not met its burden of proving that the parties' subsequent course of dealing modified the Hospital Pool Treaty.

 LLIC presents several deposition excerpts and affidavits to demonstrate that the parties modified the Hospital Pool Treaty. For example, LLIC submits the deposition testimony of Bob Dube to demonstrate a subsequent modification. However, Dube's deposition testimony actually suggests that the parties did not agree to a subsequent modification:

Q: So you knew going in that with regard to the hospital pool the treaty called for ERU to be the sole administrator for the hospital pool; correct?

A: Yes. But I would comment that at the time of this meeting when I signed this document in front of Joe Malone I made a misjudgment. I spoke with him and indicated that I was, I objected to that particular paragraph, and you can ask Bob Parker who co-signed for this because he was present at that particular meeting, that ERU would be the sole administrator for business produced by its distribution system and that any business produced by the Lafayette Life distribution system would be at our discretion to determine who would do the administration. It doesn't say that, but that was part of the meeting. And **in the spirit of getting this deal underway I signed this document which was a misjudgment on my part, which as the relationship continued and went on I challenged Mr. Malone a number of times on that issue which ultimately resulted in us canceling this agreement.**

(LLIC's Opposition to ERU's Motion for SJ Count Six, Exh. C at 176–77). In his

deposition, he states, referring to the Treaty, "I read it. I commented on it, I asked that it be amended, it never took place, I signed it. It was a misjudgment." (LLIC's Opposition to ERU's Motion for SJ Count Six, Exh. C at 178). Dube stated that he protested prior to signing the Treaty and "reminded [Malone] of it over the period of time." (LLIC's Opposition to ERU's Motion for SJ Count Six, Exh. C at 178). Notably, Dube admits that he voiced protest prior to signing but never states that he came to a subsequent agreement with Malone. In fact, Dube's testimony that he challenged Malone as to the policy regarding written consent and ultimately cancelled the Treaty as a result of Malone's unwillingness to agree is clear and persuasive evidence that the parties did not come to a mutual agreement to modify the contract. A modification cannot legally exist absent mutually consent of the parties. *Newkirk Construction Corp. v. Gulf County*, 366 So.2d 813, 815 (Fla. 1st DCA 1979) ("Modifications of contracts must be supported by new consideration as well as the consent of both parties.").

Finally, LLIC attempts to show a modification through testimony and various exhibits analyzed at Martin Cullen's deposition. I have reviewed this testimony and the exhibits attached thereto and conclude that they contain no evidence of a consensual modification to the Hospital Pool Treaty whereby LLIC could retain cases for administration absent Munich Re's written consent. The deposition testimony and exhibits evince Cullen's understanding that Joe Malone must provide written approval before LLIC could retain cases to administer. (LLIC's Opposition to ERU's Motion for SJ Count Six, Exh. C at 327 and attached June 23, 1999 Letter from Cullen to Dube).

LLIC also attempts to show a modification via the declarations of Michael Berkowitz, former President of ERU, Michael Reid, former Vice President and Chief Marketing Officer of ERU, and Robert Parker, Assistant Vice President for Underwriting in the Group Department of LLIC. (LLIC's Opposition to ERU's Motion for SJ Count Six, Exh. D and Exh. G). Parker was present with Bob Dube and Joe Malone when the parties discussed and signed the Treaty. Parker states that Dube objected to the written consent requirement, but his affidavit does not discuss anything that occurred *after* the contract was signed. Accordingly, it presents no material question of fact regarding a *subsequent* modification. The affidavits of Reid and Berkowitz likewise do not support LLIC's contention that LLIC and Munich Re modified the Hospital Pool Treaty. Berkowitz and Reid describe ERU's business relationship with LLIC but do not speak to the Hospital Pool Treaty between LLIC and Munich Re. The affidavits are thus immaterial to Count Six of the Third Amended Complaint. Accordingly, ERU's Motion to Strike [DE 244] is denied as moot.[8]

LLIC has failed to demonstrate a consensual modification of the Hospital Pool Treaty. LLIC's modification argument fails as a matter of law for another reason: there exists no evidence to indicate that the alleged subsequent modification was supported by new consideration. *See Ac-*

8. ERU also seeks a protective order and fees and costs in its Motion to Strike. If ERU wishes to pursue these motions, ERU may refile a motion with respect to these issues only and that motion shall be referred to the Magistrate Judge pursuant to 28 U.S.C. § 636 and the Magistrate Rules of the Local Rules of the Southern District of Florida

*quisition Corp. of America v. Federal Deposit Ins. Corp.,* 760 F.Supp. 1558, 1562 n. 8 (S.D.Fla.1991) (subsequent modification must be supported by new consideration); *In re Estate of Johnson,* 566 So.2d 1345, 1347 (Fla. 4th DCA 1990) (same); *Newkirk Construction Corp. v. Gulf County,* 366 So.2d 813, 815 (Fla. 1st DCA 1979) ("Modifications of contracts must be supported by new consideration as well as the consent of both parties."); *Wilson v. Odom,* 215 So.2d 37, 39 (Fla. 1st DCA 1968) (same); *compare Allapattah Services, Inc. v. Exxon Corp.,* 61 F.Supp.2d 1308, 1316 n. 13 (S.D.Fla.1999) (noting that contracts controlled by the UCC do not require a modification to be supported by consideration). The complete lack of evidence as to consent and consideration demonstrate that there was no agreement to modify the Treaty as a matter of law. As such, I conclude that ERU is entitled to summary judgment based upon the "clear and unambiguous" provision in the Hospital Pool Treaty requiring LLIC to obtain written consent from Munich Re before keeping cases to administer. There is no material dispute of fact that LLIC failed to obtain this consent and failed to transfer at least six cases to ERU for administration. Accordingly, ERU's Motion for Partial Summary Judgment as to Count Six is GRANTED.

*Count Seven: Breach of the Reinsurance Treaty Summary*

■ ERU seeks partial summary judgment as to Count Seven of the Third Amended Complaint, which alleges that LLIC breached its obligations to ERU as a third-party beneficiary of the Reinsur-

ance Treaty Summary between LLIC and Swiss Re. ERU's motion for summary judgment is partial in that ERU "only seeks an adjudication that it has rights it may enforce under the Reinsurance Treaty Summary, as its intended third-party beneficiary, for any of LLIC's breaches affecting it." [9] The parties hotly contest the scope of the Reinsurance Treaty Summary. ERU contends that ERU is entitled to act as the sole administrator for the ABLAC Block of business and any "new business." LLIC counters that the Reinsurance Treaty Summary just applied to the ABLAC renewal block policies and any new policies brought to LLIC by ERU producers, on a case-by-case basis. Accordingly, ERU does not seek summary judgment as to its particular rights under the Reinsurance Treaty Summary, but rather seeks summary judgment as to ERU's standing to sue for breach as a third-party beneficiary.

ERU argues that it is an intended third-party beneficiary of the Reinsurance Treaty Summary because the wording of the Treaty Summary shows an intent to directly and substantially benefit ERU as the selected administrator of the subject business. Unlike LLIC's stance with respect to the Hospital Pool Treaty, LLIC refutes ERU's contention that ERU was an intended third-party beneficiary of the Reinsurance Treaty Summary; LLIC contends that ERU was merely an incidental beneficiary of the Reinsurance Treaty Summary.

■ An intended third-party beneficiary is one who is recognized by the parties to an agreement to have a right of

---

9. Although the parties' briefs discuss the disputes over the scope of business covered by the Reinsurance Treaty Summary and over FDI's status as an ERU producer, ERU does not seek summary judgment on these issues, and I conclude that there exist material disputes of fact precluding summary judgment on these issues.

performance in order to effectuate the intent of the parties. Restatement (Second) of Contracts § 302(b); *Technicable Video Sys., Inc. v. Americable of Greater Miami, Ltd.,* 479 So.2d 810, 811 (Fla. 3d DCA 1985). A cause of action for breach of a third-party beneficiary contract requires the plaintiff to prove the following elements: (1) a contract between A and B, (2) the "clear" or "manifest" intent of A and B that the contract primarily and directly benefit the third-party, (3) breach of the contract by either A or B, and, (4) damages to the third-party resulting from the breach. *See Jenne v. Church & Tower, Inc.,* 814 So.2d 522, 524 (Fla. 4th DCA 2002) (citing *Caretta Trucking, Inc. v. Cheoy Lee Shipyards, Ltd.,* 647 So.2d 1028, 1031 (Fla. 4th DCA 1994)). The test is not that the promisee is liable to the third party, or that there is some privity between them, or that some consideration moved from the third person, but that the parties to the contract intended that the third party should benefit from the contract. *Id.* "It is the undertaking on the part of the promisor, as a consideration to the promisee, to benefit the third person, that gives rise to a cause of action by the beneficiary against the promisor, resting upon the contract itself." *Id.* (citing *Marianna Lime Prods. v. McKay,* 109 Fla. 275, 279, 147 So. 264, 265 (1933)).

■ Florida law looks to "nature or terms of a contract" to find the parties' clear or manifest intent that it "be for the benefit of a third party." *Id.* (quoting *Am. Sur. Co. of New York v. Smith,* 100 Fla. 1012, 1014, 130 So. 440, 441 (1930)). "The language used in a contract is the best evidence of the intent and meaning of the parties." *Id.* (citing *Boat Town U.S.A., Inc. v. Mercury Marine Div. of Brunswick Corp.,* 364 So.2d 15, 17 (Fla. 4th DCA 1978)).

The Reinsurance Treaty Summary is a two-page long series of bullet-pointed items, each followed by a short definition. For example, the Reinsurance Treaty Summary states: "Business Reinsured: All Group Life, Group Accidental Death and Dismemberment and Short Term Disability Insurance underwritten and administered by Excess Risk Underwriters (ERU)." (Third Amnd. Cmpt., Exh. Q at 2). The Treaty Summary further states: "Administration: Monthly. To be administered by ERU." (Third Amnd. Cmpt., Exh. Q at 2). These are the only provisions that directly state ERU's role as administrator.

In this case, I conclude that the language of the contract is ambiguous. I cannot discern from the language of the Reinsurance Treaty Summary whether LLIC and Swiss Re have promised any *additional* benefit to ERU that ERU was not already owed. In other words, the language of the Treaty can reasonably be interpreted to define the scope in terms of those cases *already* to be administered by ERU. A reasonable interpretation is that the Treaty defines the business to be reinsured by Swiss Re as that business which is *presently* underwritten and administered by ERU. If that is the case, then the Treaty Summary could not possibly be signed "primarily and directly" to benefit ERU because it provides no greater benefit than ERU is already owed. I conclude that this more limited interpretation of the Reinsurance Treaty Summary is as reasonable as ERU's contention that the Treaty provides that ERU will underwrite and administer all reinsurance business between LLIC and Swiss Re. The format of the contract renders both interpretations reasonable and therefore not conducive to summary judgment.

"It is well-established that as a general rule, the construction of a written contract

is a matter of law to be determined by the court, but if the wording is ambiguous and the parties present different interpretations, the *issue of proper interpretation can become one of fact*, thus precluding summary judgment." *Allen C. Ewing & Co. v. Freedle*, 521 So.2d 384, 386 (Fla. 1st DCA 1988) (emphasis in original) (citations omitted). Florida law requires that a dispute over whether a third party beneficiary is intended or incidental shall go to the jury. *See Decarlo v. Griffin*, 827 So.2d 348, 351–52 (Fla. 4th DCA 2002); *Winston v. Brogan*, 844 F.Supp. 753, 756 (S.D.Fla. 1994). Because I conclude that both LLIC and ERU have proposed reasonable interpretations of the Treaty that are materially in conflict, ERU's Motion for Partial Summary Judgment as to Count Seven is DENIED.

*Counts Ten and Twelve: Unjust Enrichment and In Quantum Meruit*

 LLIC seeks partial summary judgment on Counts Ten and Twelve of the Third Amended Complaint, which allege unjust enrichment and recovery in quantum meruit. LLIC seeks partial summary judgment with respect to those contracts it is willing to admit are legally binding, arguing that an action in quasi-contract may not be sustained where there is a showing that an express contract exists between the parties. *See, e.g., In re Estate of Lonstein*, 433 So.2d 672, 674 (Fla. 4th DCA 1983) ("The law will not imply a contract where a valid express one exists."). LLIC concedes that it entered into the Confidentiality Agreement and ERU–LLIC Agreement with ERU. Thus

LLIC argues that, as a matter of law, ERU cannot pursue remedies in quasi-contract pertaining to the alleged damages in connection with those agreements.

ERU argues in response that LLIC has denied that an express contract covers the entire subject of the dispute between the parties, and urges the Court to examine whether the express contracts govern only part or all of the disputes between the parties.[10] ERU argues that LLIC may not obtain summary judgment simply by admitting the existing of a valid contract; rather, LLIC must establish that the quasi-contract claims asserted by ERU are actually covered by a valid and enforceable contract governing the subject matter of the dispute. ERU argues that the mere existence of a contract does not preclude suit in quasi-contract if the subject matter of the contract is not the same as the subject matter of the parties' dispute. *See Solutec Corp. v. Young & Lawrence Assoc., Inc.*, 243 So.2d 605 (Fla. 4th DCA 1971) (holding that proof of an express agreement between the parties as to compensation for services rendered precluded suit in quantum meruit for compensation).

 ERU's statement of the law is valid. The mere existence of an express contract cannot preclude suit in quasi-contract for disputes that are not governed by the subject matter of the contract. LLIC's motion for summary judgment is meritorious with respect to the Confidentiality Agreement because there is no dispute about the validity and subject matter of that Agreement. Similarly, LLIC's motion for summary judgment is valid with

10. ERU seems to dispute whether LLIC has admitted that the ERU–LLIC Agreement is a valid and enforceable contract. Yet in its Statement of Material Undisputed Facts, LLIC states, "Lafayette admits that it entered into the letter agreement of November 13, 1997 with ERU, which the Complaint refers to as the 'ERU–LLIC Agreement.'" (SJ Counts 10/12, Def's 7.5 Stat. ¶ 12).

respect to ERU's claims in quasi-contract pertaining the ABLAC renewal block of policies because the ERU–LLIC Agreement expressly governs those policies. However, ERU raises a valid objection to summary judgment on Counts Ten and Twelve with respect to new business not expressly governed by the ERU–LLIC Agreement. I have previously stated in this Order that the ERU–LLIC Agreement is arguably limited in its scope to the ABLAC renewal block of business and any new business brought to LLIC by ERU producers. Accordingly, the subject matter of the dispute between ERU and LLIC in Counts Ten and Twelve includes more than what is governed by the express agreement between the parties. For example, ERU has alleged that LLIC and ERU made arrangements regarding the transfer of cases that were not part of the ABLAC block and not brought to LLIC by ERU producers. The law requires that LLIC not be unjustly enriched if ERU can show that LLIC benefited from those arrangements to the detriment of ERU. As such, LLIC's motion for summary judgment is GRANTED IN PART and DENIED IN PART. It is granted with respect to ERU's claims for unjust enrichment and breach of implied in fact contract (quantum meruit) for violation of confidentiality and for conduct pertaining to the ABLAC renewal block of policies, and denied in all other respects.

Accordingly, it is hereby ORDERED AND ADJUDGED that:

1. LLIC's motion for partial summary judgment on Count Five [DE 223] is GRANTED.
2. ERU's motion for partial summary judgment on Count Six [DE 217] is GRANTED.
3. ERU's motion for partial summary judgment on Count Seven [DE 227] is DENIED.
4. LLIC's motion for partial summary judgment upon Counts Ten and Twelve of Third Amended Complaint [DE 225] is GRANTED IN PART and DENIED IN PART. It is granted with respect to ERU's claims for unjust enrichment and breach of implied in fact contract (quantum meruit) for violation of confidentiality and for conduct pertaining to the ABLAC renewal block of policies, and denied in all other respects.
5. ERU's motion for partial summary judgment as to Count Four [DE 226] is DENIED.
6. ERU's Motion to Strike, Motion for Protective Order, and Motion for Fees and Costs [DE 244] is DENIED AS MOOT. The Motion for Protective Order and for Fees and Costs is DENIED WITHOUT PREJUDICE.